874 So.2d 279 (2004)
STATE of Louisiana
v.
Brandon STEIN.
No. 04-KA-23.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
*282 Harry J. Morel, Jr., District Attorney, Howat A. Peters, Jr., Assistant District Attorney, Hahnville, LA, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, Gretna, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA, and THOMAS F. DALEY.
THOMAS F. DALEY, Judge.
Defendant, Brandon Stein, appeals his conviction for second degree murder in the homicide of James Rogers. On appeal, he assigns three errors of the trial court: 1) the trial court erred in denying his challenges for cause concerning three jurors; 2) the trial court erred in denying the Motion to Suppress his statement; and 3) the evidence was insufficient to support the verdict. After thorough review, we affirm.
On March 14, 2002, the St. Charles Parish Grand Jury issued a bill of indictment charging Brandon Stein with second degree murder. LSA-R.S. 14:30.1. Calvin Couvillion and Timothy Prudhomme were charged as co-defendants. Stein was arraigned on April 3, 2002, and apparently entered a plea of not guilty.[1]
Stein made pretrial motions to suppress statements and evidence. The record contains no written suppression motions. An inquiry by this court to the district court revealed that those motions were made orally.[2]
On January 10, 2003, the trial court heard and denied Stein's Motion to Suppress the recorded statement he made on February 16, 2002, while in the custody of *283 the St. Charles Parish Sheriff's Office. On February 21, 2003, the court heard and denied Stein's Motion to Suppress the statement he made to St. John the Baptist Parish detectives.
On February 21, 2003, the court heard and denied a Motion to Suppress the evidence seized from the home of defendant's cousin, Michelle Mayfield. On the same day, the court heard a Motion to Suppress evidence recovered from the home of Stein's grandmother, Theresa Tassin. The court held that Motion open for the presentation of additional evidence. The court heard a Motion to Suppress evidence seized at 14855 Old Spanish Trail, the alleged scene of the murder. The court also held that Motion open for additional testimony. On February 26, 2003, the court denied the Motions to Suppress the evidence from Ms. Tassin's house and from the house on Old Spanish Trail.
Stein was tried separately before a twelve-person jury on March 24, 25 and 26, 2003.[3] The jury returned a verdict of guilty as charged. On June 4, 2003, the trial court sentenced Stein to a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence. Stein made an oral Motion for Appeal.
FACTS
Tuesday, February 12, 2002 was Mardi Gras Day. Dr. Wayne Rogers, a LaPlace veterinarian, testified that his seventeen-year-old son, James Rogers ("Jim"), the victim, went out with friends that night, driving his Ford Ranger truck. Mr. and Mrs. Rogers expected him either to telephone them or to return home by midnight. Sometime between 2:00 and 3:00 a.m. on February 13th, Mrs. Rogers awakened Dr. Rogers to tell him their son had not yet returned. Later that morning, Dr. Rogers telephoned the St. John the Baptist Parish Sheriff's Office to report Jim missing.
Believing that Jim met or went out with defendant Stein on Tuesday night, Dr. Rogers located Stein and asked him if he knew Jim's whereabouts. Stein responded that he and Jim had planned to meet the previous night, but that Jim had never arrived. Stein said that Jim was supposed to have bought some marijuana at the LaPlace housing project before picking him up. Dr. Rogers told Stein he believed Jim was dead, and that the St. John the Baptist Parish Sheriff's Office was looking for him. Dr. Rogers testified that Stein turned pale and his hands began to twitch.
Major Robert Hay of the St. John the Baptist Parish Sheriff's Office testified that his department questioned Rogers's family and friends in an effort to locate him. He and other officers found Rogers's truck on the afternoon of February 13, 2002 in the 600 block of West Fifth Street. It appeared to have been abandoned. The driver's side window of the vehicle was broken and the stereo had been removed; apparently by force. Major Hay testified that, on February 13th, detectives questioned sixteen-year-old Timothy Prudhomme, Stein's cousin, concerning Jim Rogers's whereabouts.
Detective Sergeant Royal Burke conducted a tape recorded interview with Stein at the St. John the Baptist Parish Sheriff's Office on the afternoon of February 14, 2002. The tape was entered in evidence at trial, and was played for the jury. Stein said that on the night of February 12th, he called Jim's pager. Jim telephoned Stein, and Stein asked Jim if he wanted to get together to smoke marijuana or drink. On Stein's instruction, Jim picked up his cousin, Timmy *284 Prudhomme. Jim then picked up Stein. The three went to a convenience store where Stein bought alcohol for all of them. He also bought a cigar, which the young men filled with marijuana and smoked. They also drank as they road around in Jim's truck. They did not go into the LaPlace housing project.
Stein said he was contacted by an acquaintance named George. Jim dropped off Stein and Prudhomme at a convenience store. From there, they walked to a nearby Wal-Mart store, where George picked them up. Stein said he did not see Jim after Jim left Prudhomme and him at the convenience store.
After the interview was completed, Stein was allowed to leave the sheriff's office. Detective Sergeant Burke conducted a second interview with Timothy Prudhomme on February 15, 2002 in an attempt to resolve discrepancies between his statement and Stein's. Based on information gleaned during that interview, the St. John the Baptist Parish Sheriff's Office informed the St. Charles Parish Sheriff's Office of a possible location for the missing boy.
At about 5:30 p.m. on February 15, 2002, Detective Sergeant Rodney Madere and several other St. Charles Parish deputies located Jim Rogers's body. It was visible from an overpass leading from Interstate 310. The body lay on a small "island" of land in the marsh. Detective Roscoe Brewer testified that it was obvious the victim had been dropped from a considerable height, as there was an indentation in the piece of ground where the body lay. Rogers was partially wrapped in a blanket, and there was a mattress lying fifty feet away. The body was difficult to reach, as it was surrounded by marsh. Detective Brewer testified that he and other officers used an all terrain vehicle and a small boat to recover the body.
Dr. Susan Garcia, an expert in forensic pathology, testified that she performed an autopsy on the body of Jim Rogers. She listed his death as a homicide, and determined the cause of death was asphyxiation due to ligature strangulation. Dr. Garcia testified that something was placed around the victim's neck and tightened so as to cut off the flow of blood to and from the brain. She pointed out that there were marks on the victim's neck that she believed were the result of a ligature, as opposed to manual strangulation. Dr. Garcia testified that although the victim was found in water, there was no evidence that he had drowned. Blood, urine and vitreous fluid samples taken from the body showed an elevated level of alcohol, as well as THC, the active metabolite in marijuana.
Detective Sergeant Madere testified that, once Jim Rogers's body was found, he obtained a warrant in St. Charles Parish for Stein's arrest. Stein was subsequently arrested in St. John the Baptist Parish. Detective Sergeant Madere testified that Timothy Prudhomme led him and other officers to 14855 Old Spanish Trail, the home of defendant's friend, Calvin Couvillion. Prudhomme indicated to officers that Jim Rogers's murder had occurred at that residence. Officers found Calvin Couvillion there, along with Traci Caillet, Britney Dufrene, and Terrel Gisclair.
Traci Caillet and Calvin Couvillion were brought to the detective bureau of the St. Charles Sheriff's Office. The other two individuals were released. Detective Sergeant Madere testified that officers were left to secure the house on Old Spanish Trail while he obtained a search warrant for the residence. Detectives Claude Adams and Othello Carter retrieved Stein from St. John the Baptist Parish authorities. Those officers transported Stein to the detective bureau. Adams, Madere, *285 and other deputies then returned to Calvin Couvillion's residence to execute a search warrant. Among the items found in the search was a box spring that appeared to match the mattress found with the body.
Detective Sergeant Madere testified that he interviewed Calvin Couvillion and Traci Caillet. Madere and Detective Roscoe Brewer conducted a tape recorded interview with Stein at the detective bureau on February 16, 2002 at 2:18 p.m. The tape was entered into evidence and was played for the jury.
Stein told Madere that on the night of February 12, 2002, Jim picked him up in his (Jim's) truck. Timothy Prudhomme was in the truck with Jim. Their plan was to do drugs and drink together. The three stopped at a convenience store, where Stein bought Prudhomme two small bottles of Mad Dog (a cheap wine), a six-pack of Smirnoff Ice (vodka) for himself, and a large bottle of Mad Dog for Jim. Stein also bought a cigar.
Stein related that Jim drove to Calvin's house in Luling. Once there, the three young men cut open the cigar and made a "blunt" by stuffing it with marijuana. They smoked the blunt and drank the alcohol Stein had purchased. Calvin and his girlfriend, Traci, were there, as were several other people. Stein bought a small bag of cocaine from an unknown woman at the house. He put some of it in a marijuana cigarette and then shared the cigarette with some of the others.
Some time later, only Stein, Calvin, Jim, and Timmy remained. Stein stated that Jim said he wanted to leave. Jim started to walk toward the door. Stein and Rogers started to argue. Stein took off his belt, wrapped it around Jim's neck, and began to strangle him. Stein said Calvin aided him by beating Jim while Stein continued to strangle him. Timmy did not participate in the attack; he sat and watched television. Jim struggled with Stein, and said, "Man why are ya'll doing this to me?"
Stein stated that Jim died in the master bedroom, close to the back door of the house. Stein and his companions wrapped Jim's body in a blanket and put it in the back of Jim's pickup truck. They put a mattress from the house on top of the body to conceal it. Stein drove the truck, while Prudhomme rode in the passenger seat. Calvin Couvillion sat on top of the mattress in the back of the truck.
Stein said he stopped the truck on the interstate at the Norco Bridge exit. He threw the body and the mattress over the side of the bridge. Stein and Prudhomme removed the stereo system from the truck, and left the equipment at the home of Stein's grandmother. Stein drove the truck to the LaPlace housing project and left it there. He then walked to the home of his cousin, Michelle Mayfield, and spent the rest of the night there. Stein said he hid the keys to the truck under a shed in Ms. Mayfield's yard.
Detective Brewer testified that he and other officers went to the LaPlace home of Stein's cousin, Michelle Mayfield. They found the keys to the victim's truck in a clear plastic bag under Ms. Mayfield's shed. Brewer further testified that Theresa Tassin, Stein's grandmother, gave her consent for officers to search her house. Brewer located the victim's car stereo in Ms. Tassin's converted garage.
Brandon Stein testified on his own behalf at trial. He said he and Jim Rogers were friends, and that they both attended East St. John High School. Defendant knew Calvin Couvillion because they had once lived on the same street. Stein testified that he smoked marijuana on a daily basis, and that he took other drugs as well. He was often joined in his drug use by Jim *286 and other friends. Stein also bought liquor for Jim on a regular basis.
Stein admitted that he killed Jim. He testified that on the night of February 12, 2002, Jim picked him up at Michelle Mayfield's house, where he had been babysitting. Prudhomme was already in the truck. The three of them went to a convenience store, where Stein bought liquor and a cigar.
They rode to Calvin Couvillion's house, drinking along the way. Once there, they put some marijuana inside the cigar and smoked it. Stein bought cocaine from someone at the house. He put some of the cocaine in a marijuana cigarette and smoked it. Then he snorted the rest of the cocaine. Stein said that Jim did not consume any cocaine.
When Stein and his companions had been at Calvin's house for an hour, Jim said he wanted to leave. Stein, who depended on Jim for a ride home, asked his friend to stay longer. He told Jim he did not want to go home "all messed up."[4] Jim agreed to stay. Five minutes later, Jim went to the door in an attempt to leave the house. Stein approached Jim and complained to Jim that he had agreed to stay there for a while longer. The two argued, and Jim pushed defendant. A fistfight ensued, and Calvin Couvillion became involved in the altercation.
Stein testified that he removed the belt he was wearing, put it around Jim's neck, and used it to pull Jim to the floor. He strangled Jim, and the victim died within three to four minutes.[5] While Stein was strangling Jim, Timmy Prudhomme sat watching television. Stein testified that he did not put the belt around Jim's neck to keep him from leaving Calvin's house; he killed Jim because they were fighting.
Stein and Couvillion wrapped the victim's body in a blanket and put it in the back of Jim's truck. Couvillion put a mattress on top of the body. Stein drove the truck. He first dropped off Couvillion at a nearby apartment. Stein and Prudhomme then took Jim's body to a bridge, where Stein disposed of it while Prudhomme waited in the truck.
Stein said that he drove the truck to his grandmother's house, where he removed the truck's stereo system so that it would appear that the truck had been stolen or burglarized. Stein drove Prudhomme home, and then spent the night at the home of his cousin, Michelle Mayfield, where he hid the keys to the truck under the shed.
Stein identified a letter he sent to the victim's parents in October, 2002. In the letter Stein apologized to the Rogerses for having killed "one of my best friends."
ASSIGNMENT OF ERROR NUMBER THREE
The evidence was insufficient to support the verdict.
Stein contends that the state failed to prove he was guilty of second degree murder, as the evidence showed he was intoxicated at the time of the offense, and was thus unable to form the requisite intent. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence *287 that was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issue regarding trial errors becomes moot.[6] For the foregoing reasons, Stein's third assignment will be addressed first.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[7] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[8]
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). The crime is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of the enumerated felonies. LSA-R.S. 14:30.1(A)(2)(a). Prior to trial, the state noticed its intention to proceed under the theory of specific intent.
Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as fact, but may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim's injuries.[9]
LSA-R.S. 14:15, pertaining to the defense of intoxication, provides:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
Intoxication is in the nature of an affirmative defense to a criminal charge and the burden is on the defendant to prove the existence of that condition at the time of the offense.[10] When a defendant raises intoxication as a defense, he must prove, by a preponderance of the evidence, that he was in fact intoxicated. When circumstances exist that indicate that intoxication could have precluded specific intent, the burden shifts to the state to show, beyond a reasonable doubt, that defendant possessed specific intent.[11]
*288 Stein's mother, Penny Waguespack, testified that she had, on occasion, caught him smoking marijuana. She further testified that she had never seen him drink alcohol, but that she had smelled it on his breath at times. Stein's twin sister, Jennifer Stein, testified that he smoked marijuana on a regular basis. His parents refused to buy him his own vehicle because his stepfather had caught him using marijuana. While neither Jennifer Stein nor Ms. Waguespack could say that they knew Stein used drugs and alcohol, neither had firsthand knowledge of whether he was intoxicated at the time of the murder. The only evidence Stein produced with regard to his level of intoxication at the time of the offense was his own testimony.
Stein testified that he and the victim consumed alcohol and marijuana on the night of February 12, 2002. Stein also testified that he smoked and snorted cocaine that night. Stein's testimony was consistent with information he gave St. Charles Parish detectives following his arrest. However, there was nothing at trial to corroborate his assertions, with the exception of Dr. Garcia's testimony that tests showed the victim had used alcohol and marijuana. Detective Madere testified that, aside from Stein's own claims, he discovered no evidence that Stein was under the influence of drugs or alcohol at the time of the offense.
As the ultimate fact finder, the jury determines whether a defendant has proven intoxication and whether the state has negated the defense beyond a reasonable doubt.[12] The jury apparently rejected Stein's argument that he was drugged and/or intoxicated to the point that he could not form the specific intent to kill. Even assuming that Stein met his burden of proving intoxication by a preponderance of the evidence, it appears the state negated the defense by proving beyond a reasonable doubt that Stein had the specific intent to kill.
In his recorded interview with Detective Madere, Stein admitted to arguing with the victim about whether they should leave Calvin Couvillion's house. Stein further confessed to having removed his belt and tightening it around the victim's neck.[13] Stein used the belt and his arm to choke Jim Rogers. In addition, he hit Rogers with his fist. Even though the victim struggled with him and asked, "Man, why are ya'll doing this to me?" Stein continued to choke him. Stein told Detective Madere that, as Jim Rogers continued to resist, he (defendant) said, "Goddamn, when he's gonna die?" Stein also told the detective that he believed Jim Rogers knew he and Calvin were trying to kill him.
Once Jim Rogers had died, Stein and his companions loaded the body into the victim's truck and dumped it in a remote location. He used a blanket and a mattress to conceal the body in the back of the truck. After dumping the body, Stein determined that he should leave the truck in the local housing project so it would appear that Jim's disappearance was related to a robbery. In order to further that plan, Stein removed the truck's stereo system and hid it at his grandmother's house. He then concealed the truck's keys at his cousin's residence. At trial, Stein repeated the admissions he made during his police statement.
*289 Despite the alcohol and drugs Stein claimed to have consumed, he was apparently capable of sustaining the will to apply force to the victim for the time it took the young man to die. Stein then had the presence of mind to dispose of the body and the victim's property in a manner calculated to avert suspicion from himself. Moreover, Stein's mind was not so clouded by drugs and alcohol that he could not later recall the events of that night in great detail.
In viewing the evidence in the light most favorable to the prosecution, the state proved the essential elements of second degree murder, and it was reasonable for the jury to find that Stein specifically intended to kill or do great bodily harm to the victim. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in denying the defendant's challenges for cause of jurors, Mr. Vasseur, Mr. Edwards, and Mr. Heulster, forcing the defense to use a peremptory challenge in the case of Mr. Vasseur, and in the case of Mr. Edwards and Mr. Heulster, forcing the defense to have them on the jury.
Stein argues that Mr. Vasseur and Mr. Edwards indicated by their voir dire responses that they could not be impartial jurors because they were acquainted with officers who were witnesses for the state, and that they were biased in favor of police testimony. Stein further contends that Mr. Heulster showed he was unable to be impartial because his stepson had dated a young woman who was peripherally associated with the police investigation. Stein moves this Court to vacate his conviction.
The State argues in brief that the defendant failed to contemporaneously object to the proceedings involving these three jurors, and thus has waived appellate review of these challenges. However, the lack of an express contemporaneous objection is not fatal to review of this Assignment of Error when the record as a whole shows an understanding among both counsel and the trial judge concerning the defense objections, and when counsel gave full reasons for the challenges at the time they were made.[14] Accordingly, we review this Assignment of Error.
Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges.[15] An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation of his rights and constitutes reversible error.[16] Therefore, to prove there has been an error warranting the reversal of a conviction and sentence, a defendant need only show: (1) the trial court's erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges.[17] The record in this case shows that Stein exhausted all of his peremptory challenges. The issue, then, is whether the trial court erred in denying defendant's challenges for cause.
LSA-C.Cr.P. art. 797 provides that a defendant may challenge a prospective juror for cause if:

*290 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence[.]
....
(4) The juror will not accept the law as given to him by the court[.]
Mr. Vasseur stated that he grew up with Sergeant Billy LeBlanc of the St. Charles Parish Sheriff's Office. Sergeant LeBlanc, a crime scene investigator, testified at trial regarding his involvement in the recovery of the victim's body. Although Mr. Vasseur said he considered Sergeant LeBlanc a friend, it had been years since they had spoken. When the judge asked whether his friendship with Sergeant LeBlanc would affect his ability to give a fair and impartial trial to both the state and the defense, Mr. Vasseur replied, "Absolutely not." (Id.). Defense counsel later asked Mr. Vasseur, "Isn't it natural that you're going to lean towards [Sergeant LeBlanc] and what he says and judge, based upon what you know about that individual from the past, of whether he's telling the truth or not? Wouldn't that make you lean in that direction?" Mr. Vasseur responded, "I would assume." Mr. Vasseur agreed with counsel that such a predisposition is part of human nature. (Id.). There is no evidence in the record that the state attempted to "rehabilitate" Mr. Vasseur by questioning him further about his ability to follow the law. The trial court denied Stein's challenge for cause as to Mr. Vasseur, without giving reasons. Stein thereafter used a peremptory challenge to excuse Mr. Vasseur.
The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased.[18] In State v. Kang,[19] the Louisiana Supreme Court summarized the law regarding challenges for cause based on bias in favor of law enforcement officers:
Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror. (cites omitted) However, a mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause. (cites omitted) Additionally, a prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. (cites omitted) But, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied. (cite omitted)
The trial court has great discretion in ruling on cause challenges because it "`has the benefit of seeing the facial expression and hearing the vocal intonations *291 of the members of the jury venire as they respond to questioning.'"[20]
In State v. Kang, supra, the Supreme Court held that the trial court did not err in denying a defense challenge for cause that was based on a prospective juror's remarks indicating his bias in favor of police testimony. In so finding, the court reversed this Court's holding.[21] The issue raised in Kang is similar to that raised by Mr. Vasseur's responses. The juror at issue in Kang stated during voir dire that his next door neighbor was a major with the Jefferson Parish Sheriff's Office. He indicated that he could put aside his dealings with his neighbor in deciding the matter before the court. When asked if he could be a fair and impartial juror in light of his association with his neighbor, Mr. Whitcomb replied, "[w]eighing testimony equally, I'm going to probably tend to put more weight on the Deputies, especially if it's on things they have observed."[22]
When the defendant challenged this juror for cause, the trial judge questioned him about his earlier responses. The trial court denied the defendant's challenge for cause, reasoning that the juror had not actually said that he would give a deputy's testimony more weight just because he or she was a deputy. Rather, the judge found that the juror's responses showed he would give weight to a deputy's training in the area of observation.
The Supreme Court agreed with the trial court's assessment, stating:
Mr. Whitcomb did not state he would give more weight to an officer's testimony regarding anything outside of his or her powers of observation, nor did he state he would automatically believe the testimony of an officer simply because he was a police officer. He simply indicated that because police officers are trained in powers of observation, he would probably give more weight to their observations. This testimony, in and of itself, does not rise to the level of a prejudicial statement such that the trial court was required to rehabilitate the prospective juror. Further, Mr. Whitcomb agreed he would initially presume defendant to be innocent and stated he would vote "not guilty" if the State did not prove beyond a reasonable doubt that the crime was not committed in self-defense. The trial court heard Mr. Whitcomb's testimony and observed his expressions and mannerisms. After review of the record, we cannot find the trial court abused its discretion in denying defendant's challenge for cause as to Mr. Whitcomb.
Kang, 02-2812 at p. 7, 859 So.2d at 654.
Following the Supreme Court's reasoning in Kang, the trial court in the instant case did not abuse its discretion in denying Stein's challenge for cause as to Mr. Vasseur. As was the case in Kang, Mr. Vasseur did not say unequivocally that he would give more weight to the deputy's testimony because he was an officer. He merely said, in response to defense counsel's lengthy and leading question, that he "would assume" he would lean toward believing Sergeant LeBlanc was telling the truth. Moreover, Mr. Vasseur initially told the judge that his friendship with Sergeant LeBlanc would not affect his ability to be fair and impartial. Under the Kang holding, the trial court did not err.
*292 We note, moreover, that Sergeant LeBlanc testified in his capacity as a crime scene investigator and specifically about his activities in recovering the victim's body. In his role in the investigation, he had no direct contact with defendant Stein. His testimony was not offered to directly establish Stein's guilt or innocence.
Prospective juror Barry Edwards stated during voir dire that Detective Rodney Madere of the St. Charles Parish Sheriff's Office had lived in his neighborhood until one and one-half years before trial.[23] When the trial judge asked Mr. Edwards whether his acquaintance with Detective Madere would affect his ability to be a fair and impartial juror, Mr. Edwards responded, "I don't believe."
Defense counsel subsequently asked Mr. Edwards, "Rodney takes the witness stand and, in your mind, when you're listening to him, don't you have the human tendency just tonot automatically, but tend to lean in his favor and say, well, you know, I've seen him before, so I got to think he's telling the truth. Isn't that natural?" Mr. Edwards responded, "Yeah, because he speaks of stuff I don't know." No attempt was made by either the court or the state to rehabilitate Mr. Edwards.
The trial court denied Stein's cause challenge, reasoning that "[Mr. Edwards] indicated he hadn't seen Detective Madere in a year-and-a-half and he felt he could be fair and impartial in this case to both sides." Defendant subsequently accepted Mr. Edwards, and he was seated on the jury.
Defense counsel had only used eight of his twelve peremptory challenges when he accepted Mr. Edwards as a juror. Since defendant accepted Mr. Edwards after his challenge for cause was rejected without exercising one of his remaining peremptory challenges, he waived his right to assert his claim on appeal as to that juror.[24]
Juror William Heulster stated that his stepson had dated a young woman who was at the scene shortly before the murder occurred. His stepson was no longer dating the girl at the time of the murder, but he learned about the incident from friends who were associated with it. When the judge asked Mr. Heulster what his stepson had told him, Heulster replied, "Just said that it happened at a party. And according to him, everybody was drunk and I don't know what else." Mr. Heulster said he had not drawn any conclusions about who might be responsible for the crime, or formed an opinion as to Stein's guilt or innocence. He further stated that, although his stepson was living with him, he would not discuss the matter with him if he were seated on the jury.
Stein moved the court to excuse Mr. Heulster for cause, as he might receive information regarding the case from his stepson. The judge denied the challenge without giving reasons. Mr. Heulster was ultimately seated as an alternate juror, as Stein had no peremptory challenges left. One of the jurors was excused due to illness on the second day of trial, and the court replaced her with Mr. Heulster.
The trial court did not err in denying defendant's challenge for cause as to Mr. Heulster. Viewing Mr. Heulster's responses as a whole, it appears he was able and willing to follow the law as instructed. He stated that he would not allow himself *293 to be influenced by outside information about the case, and he told the judge that he could give a fair and impartial hearing to both the state and the defense.
Compare State v. Frank,[25] in which the court held that if a juror who has acquired knowledge about the case through the media can sufficiently lay aside his or her impression of the defendant's guilt or innocence and render a verdict based on the evidence presented, he or she is competent to serve as a juror.
In State v. Hoffman.[26] the trial court denied the defendant's cause challenge of a juror on grounds that she appeared to have formed an opinion about the case based on media coverage she had seen. In the defendant's view, the juror gave a vague response to the trial court's question of whether she could put aside what she had heard and base the verdict on the evidence. She answered, "I think that I could. Coming into the jury pool, I sort oflike, I was going to have preconceived notions, but I don't know anything about this defendant, so I think I could."[27] The Supreme Court noted that, standing alone, the juror's response might seem ambiguous, but that her responses as a whole indicated her opinion would yield to the evidence presented. The juror acknowledged that media accounts were frequently inaccurate,' and that she could make a decision based on the facts presented at trial.
Mr. Heulster gave far less equivocal responses than did the juror in Hoffman. Mr. Edwards firmly stated that he had not drawn any conclusions as to who had committed the murder, or as to Stein's guilt or innocence. Based on the foregoing, the trial court's denial of challenges for cause as to jurors Vasseur and Heulster do not constitute reversible error.
ASSIGNMENT OF ERROR NUMBER TWO
Stein complains that the trial court erred in failing to suppress the recorded statement he made in St. Charles Parish following his arrest. He argues that he invoked his right to remain silent in St. John the Baptist Parish prior to his transfer to St. Charles Parish. He further argues that his waiver of rights with regard to the statement was not valid, as he was intoxicated. Lastly, Stein claims the investigating officers coerced the confession by telling him he would receive a life sentence unless he cooperated with the investigation. Stein made an oral Motion to Suppress the statement he gave to Detective Madere on February 16, 2002. The trial court heard and denied the motion on January 10, 2003.
Before an inculpatory statement made during custodial interrogation may be introduced in evidence, the state must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[28] rights and that the statement was made freely and voluntarily. The state must further prove that the statement was not made under the influence of fear, intimidation, menaces, threats, inducements or promises.[29] A determination *294 of voluntariness is made on a case-by-case basis, depending on the surrounding facts and circumstances.[30]
The admissibility of a confession is a determination for the trial judge, and his conclusions on the credibility and weight of the testimony relating to the voluntariness of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.[31] In reviewing the trial court's ruling on a Motion to Suppress, an appellate court is not limited to the evidence adduced at the motion hearing, but may also consider the evidence adduced at trial.[32]
On February 16, 2002, Stein was transported to the Criminal Investigations Division of the St. Charles Parish Sheriff's Office. He was placed in Detective Othello Carter's office. Detective Madere testified that neither he nor other officers attempted to question Stein, as they were aware that he had refused to waive his right to remain silent after he was arrested in St. John the Baptist Parish.
According to Detective Madere's testimony, Stein asked Detective Madere when he would get a turn to talk. Detective Madere responded that he could not question Stein, as he had declined to waive his rights in St. John the Baptist Parish. Detective Madere testified that Detective Carter, who had transported Stein from St. John the Baptist Parish, had informed him of defendant's refusal to waive his rights. Stein continued to ask Detective Madere for a chance to talk. When Detective
Madere asked him about his refusal to waive his rights in St. John the Baptist Parish, Stein replied that he had not been paying attention when St. John the Baptist Parish deputies explained his rights. Stein said he was unaware that he had refused to waive his rights. He insisted that he now wanted to give a statement.
Detective Madere testified that he noticed Stein was wearing a belt, and commented to another detective that they should take the belt as evidence. Stein then told Detective Madere that the belt he was wearing was the one he had used to kill the victim. In the presence of Detective Madere and Detective Roscoe Brewer, Detective Carter advised Stein of his rights. The detectives reviewed a standard Waiver of Rights form with Stein. The rights advisal was tape recorded.[33]
Detective Madere testified that Stein appeared to understand his rights as they were explained to him.[34] Stein told the officers that he wished to waive his rights and make a statement. Both Detectives Madere and Carter testified that no threats or promises were made in order to persuade Stein to make a statement.
Stein testified at the motion hearing that he remembered his refusal to make a statement in St. John the Baptist Parish. He said he did not ask Detective Madere when he would get his turn to speak. He recalled that Detectives Madere and Carter advised him of his rights, and that he signed and initialed some papers. He testified that he was advised of his right to remain silent, and that he decided to make *295 a statement to the St. Charles Parish detectives. Stein further testified that he was not sure what his motive was for giving the statement.
When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to remain silent.[35] A determination of whether police have scrupulously honored an accused's right to silence requires consideration of a totality of the circumstances.[36] Factors to be included in that assessment include who initiates further questioning, although police are not barred from reinitiating contact after the defendant invokes his right to remain silent; whether there has been a substantial delay between the original request and subsequent interrogation; whether signed Miranda waivers are obtained; and whether the later interrogation is directed at a crime that was not a subject of the earlier questioning. Id.
In the instant case, all of the foregoing factors favor the state. Detective Madere's testimony indicates that he and the other detectives were aware of Stein's refusal to speak to St. John the Baptist Parish deputies, and it was his intention to honor defendant's decision to remain silent. If Detective Madere's testimony is believed, Stein actually initiated contact with him. Even if the officers initiated contact, the recording of the interview shows that they fully apprised Stein of his rights. The state produced defendant's signed Waiver of Rights. There is no merit to Stein's argument that the St. Charles Parish detectives violated his rights by questioning him after he invoked his right to remain silent in St. John the Baptist Parish.
Stein testified at the suppression hearing that after he was transported to the Criminal Investigations Division of the St. Charles Parish Sheriff's Office, Detective Madere told him things would be easier for him if he gave a statement. Stein further testified that Detective Madere stood in the doorway of the office and, with an angry expression on his face, said the word "life." According to Stein, Detective Madere made the statement before he turned on the tape recorder. Stein felt he would receive a life sentence if he did not make a statement. Detective Madere denied making these statements to Stein.
Stein testified he was not threatened or coerced into indicating on the rights form that he wished to waive his rights. Upon further questioning, however, Stein said he was not physically abused, but felt as if he were forced to make a statement after Detective Madere told him he could receive a life sentence. Stein testified that when he gave his recorded confession, he spoke freely and voluntarily, and he was not threatened or coerced.
As noted above, both Detective Madere and Detective Carter testified that they did not threaten Stein or promise him anything in exchange for his confession. The trial judge apparently found the officers' testimony more credible than Stein's. The judge's ruling is supported by the evidence. It does not appear that Stein was subjected to coercion sufficient to vitiate the voluntariness of his statement.
Intoxication renders a confession involuntary when the intoxication is of such a degree as to negate the defendant's comprehension and to make him unconscious *296 of the consequences of what he is saying.[37] Whether intoxication existed and was of a degree sufficient to vitiate the voluntariness of the confession are questions of fact, and a trial judge's determination will not be set aside unless it is not supported by the evidence. Id.
Stein testified at the motion hearing that he took two Valium tablets and "smoked a little weed" before St. John the Baptist Parish deputies arrested him. He further testified that he felt "loaded." At the time of his arrest, Stein did not tell anyone he felt loaded. He did not tell Detective Madere that he had used drugs before his arrest. When asked why he did not tell Detective Madere, he responded that Detective Madere never asked.
Based on information adduced from the state's evidence and defendant's testimony, Stein gave his statement at least ninety minutes after he allegedly consumed Valium and marijuana. Defendant testified that he consumed the Valium and marijuana about twenty minutes before he was arrested by St. John the Baptist Parish deputies. He stated that he was in the custody of the St. John the Baptist Parish authorities for thirty to forty-five minutes before the St. Charles deputies picked him up. The St. Charles Parish arrest report indicates that Detectives Carter and Adams retrieved Stein from St. John the Baptist Parish authorities at 0130 hours. Detective Madere began defendant's interview at 2:14 a.m.
At the suppression hearing, Detective Madere testified that at the time he took Stein's statement, he did not appear to be under the influence of drugs or alcohol to the extent that it "would have affected his decision making or his understanding." Detective Madere said that Stein looked tired, but there was no indication to him that he was under the influence of anything. Detective Madere testified at trial that, had Stein appeared to him to be under the influence of drugs or alcohol, he would not have taken his statement.
Based on the foregoing, the state met its burden of proving, beyond a reasonable doubt, that the voluntariness of defendant's confession was not vitiated by intoxication. This assignment of error has no merit.
ERRORS PATENT DISCUSSION
The record was reviewed for errors patent.[38] The following error patent was found. The record does not show that the judge instructed defendant on the prescriptive period in which to file an Application for Post Conviction Relief, as per LSA-C.Cr.P. art. 930.8. The trial court is hereby ordered to supply defendant with written notice of the prescriptive period under Article 930.8, and to file written proof of said notice in the record.[39]
Accordingly, the defendant's conviction is affirmed.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] The minute entry for April 3, 2002 reads, in pertinent part, "Accused present in court with counsel Mark Marino. Reading of indictment is waived. State given 10 days to provide open file discovery. Counsel given 30 days to file pleadings thereafter."
[2] Other Motions made by defendant, which are not pertinent on appeal, were a Motion to Quash Indictment, which was denied, and a Motion for Psychiatric Evaluation, which was granted with the appointment of a sanity commission, which found defendant competent to stand trial.
[3] On February 26, 2003, the state noticed its intent to sever the defendants for trial.
[4] Defendant further testified that he was to sleep at Michelle Mayfield's house that night, and he was concerned that if he arrived there while drunk or high, Michelle would tell his mother.
[5] Defendant testified that the time span of thirty to forty minutes he gave Detective Madere in his statement was inaccurate.
[6] State v. George, 95-0110, p. 6 (La. 10/16/95), 661 So.2d 975, 978; State v. Conner, 02-363, p. 7 (La.App. 5 Cir. 11/13/02), 833 So.2d 396, 401, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396.
[7] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[8] State v. Juluke, 98-0341 (La. 1/8/99), 725 So.2d 1291; State v. Williams, 99-223, p. 6 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607
[9] State v. Keating, 00-51, p. 5 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
[10] State v. Edwards, 01-116, p. 8 (La.App. 5 Cir. 6/27/01), 790 So.2d 109, 114, writ denied, 01-2235 (La.8/30/02), 823 So.2d 935.
[11] Id.; State v. Patterson, 99-994, p. 8 (La.App. 5 Cir. 1/25/00), 752 So.2d 280, 284, writ denied, 00-0753 (La.2/9/01), 785 So.2d 26.
[12] State v. Legrand, 02-1462, p. 7 (La. 12/3/03), 864 So.2d 89, 96.
[13] Defendant's admission was supported by Doctor Garcia's testimony that the victim bore ligature marks on his neck, and that the ligature was apparently tightened to the point where it cut off blood flow to and from the victim's brain.
[14] See State v. Williams, 02-1118 (La.App. 5 Cir. 4/8/03), 846 So.2d 22.
[15] State v. Kang, 02-2812, p. 3 (La. 10/21/03), 859 So.2d 649, 651.
[16] State v. Anthony, 98-0406, p. 22 (La.4/11/00), 776 So.2d 376, 391, cert denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000); State v. Bush, 02-0247, p. 8 (La.App. 5 Cir. 6/26/02), 822 So.2d 859, 865, writ denied, 02-1887 (La. 1/24/03), 836 So.2d 42.
[17] Kang, 02-2812 at p. 3, 859 So.2d at 652.
[18] State v. Williams, 00-1134, p. 2 (La.App. 5 Cir. 3/28/01), 783 So.2d 566, 567.
[19] 02-2812 at pp. 4-5, 859 So.2d at 652-653.
[20] State v. Anthony, 98-0406 at p. 25, 776 So.2d at 392 (quoting State v. Lee, 93-2810, p. 9 (La.5/23/94)), 637 So.2d 102, 108; State v. Bush, supra).
[21] See, State v. Kang, 01-1262 (La.App. 5 Cir. 10/29/02), 831 So.2d 409.
[22] Kang, 02-2812 at p. 4, 859 So.2d at 652.
[23] Detective Madere was the supervising officer of the murder investigation, and recorded defendant's confession.
[24] State v. Bourque, 622 So.2d 198, 229-230 (La. 1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Kennerson, 96-1518, p. 25 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1383.
[25] 99-0553, p. 19 (La.1/17/01), 803 So.2d 1, 18.
[26] 98-3118 (La.4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
[27] Hoffman, 98-3118 at p. 17, 768 So.2d at 561.
[28] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[29] LSA-R.S. 15:451; State v. Comeaux, 93-2729 at p. 47, 699 So.2d at 29; State v. Quest, 00-205, p. 9 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La. 11/2/01), 800 So.2d 866.
[30] State v. Quest, supra.
[31] State v. Quest, supra.
[32] State v. Onezime, 01-1018, p. 17 (La.App. 5 Cir. 2/26/02), 811 So.2d 1033, 1043-1044, writ denied, 02-1099 (La.3/21/03), 840 So.2d 535.
[33] See the transcript of the recorded statement, Exhibit Folder, pp. 3-5.
[34] Madere testified that although defendant did not give a verbal response on tape when asked whether he understood his rights, he shook his in the affirmative.
[35] State v. Taylor, 01-1638, pp. 6-7 (La. 1/14/03), 838 So.2d 729, 739, cert. denied, ___ U.S. ___, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004) (citing Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975)).
[36] Taylor, supra.
[37] State v. Redditt, 03-0354 (La.App. 5 Cir. 10/28/03), 868 So.2d 704; State v. Quest, 00-205 at p. 9, 772 So.2d at 780.
[38] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[39] See, State v. Stelly, 98-578, p. 6 (La.App. 5 Cir. 12/16/98), 725 So.2d 562, 564.