WALTER J. ROTHSCHILD, Judge.
L.On July 6, 2004, a St. John the Baptist Parish Grand Jury returned an indictment charging defendant, Tyrone Raymond, with first degree murder, in violation of LSA-R.S. 14:30. He pled not guilty. On May 20, 2008, the State amended the indictment to charge defendant with second degree murder, in violation of LSA-R.S. 14:30.1. He was arraigned on the amended indictment and pled not guilty. On May *581 20, 21, and 22, 2008, the case was tried before a 12-person jury which found defendant guilty of second degree murder. On June 26, 2008, the trial judge sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

FACTS

On April 23, 2000, at approximately 7:00 a.m., Officer Clay Rauch of the St. John Parish Sheriffs Office was dispatched to Woodland Drive in Laplace regarding a vehicle being parked on a dirt road next to a canal. Upon arrival, Officer Rauch observed a Chrysler New Yorker vehicle, so he “ran the plates” in order to locate its owner. The dispatcher informed him that Janice Fugate was the owner of the vehicle and that her address was 2308 Cambridge Drive. Officers | .¡called the residence, but there was no answer, so they went there and knocked on the door. No one answered, so Officer Rauch left and came back at approximately 7:40 a.m. When he returned, neighbors informed him that Ms. Fugate had been burglarized several times, so she stayed in her back room with the door locked.
Officer Rauch went to the back door and saw that it was ajar, so he called for backup to search the residence. When Officer Terrill St. Martin arrived, he noticed a screwdriver lying on the ground next to the back door. He and Officer Rauch went inside. There were blood smears on the light switches and walls and bloody shoeprints throughout the residence. Officer St. Martin observed that the door of the bedroom had been forced open. Inside the bedroom, they saw Ms. Fugate on the floor face up with a clear plastic bag over her head and an extension cord wrapped around her neck. Her face and head were bruised and swollen. Additionally, Ms. Fugate’s shirt was lifted up, exposing her breasts.
Dr. Fraser Mackenzie performed an autopsy on Ms. Fugate and found that the cause of her death was strangulation by manual and ligature application. He observed that she had a shallow stab wound by her right eye and a deep stab wound in her neck, but neither of those wounds was fatal. During the autopsy, a crime scene technician collected fingernail scrapings from Ms. Fugate’s hands.
Natasha Poe, an expert DNA analyst, testified that she compared the right hand fingernail scrapings from Ms. Fugate with known DNA from Ms. Fugate and defendant. In her opinion, it was 2.31 billion times more likely to be a mixture of DNA from Ms. Fugate and defendant than a mixture of DNA from Ms. Fugate and another unknown individual.
Detective Felix Joseph interviewed defendant who denied any involvement in the homicide. Defendant explained that, on the night of April 22nd, he did not go to work. Instead, he claimed that he spent the night at his friend Kelly Roper’s |4house and that he left Ms. Roper’s house at 4:30 a.m. to go to Joy’s Lounge. According to Detective Joseph, defendant stated that he knew Ms. Fugate, who was his next-door neighbor, but he had only been in her residence a couple of times to help her move furniture.
Detective Joseph interviewed Ms. Roper who initially confirmed defendant’s story. However, when he spoke to Ms. Roper a second time, her story changed. Ms. Roper testified that on April 23rd at 11:00 a.m., she was, in her front yard sitting on a swing and smoking a cigarette when defendant drove up. He was very sweaty and breathing heavily. Ms. Roper noticed that defendant had a couple of fresh scratch marks on his right arm. When Ms. Roper asked defendant what was wrong, he responded that he had gotten into a confrontation with his neighbor, that *582 it had progressed into a fight, and that he had stabbed, choked, and killed her. Defendant explained that he had done that because he was “getting tired” of her and that she often called the police about him. After confessing to Ms. Roper, defendant stayed in her yard for an hour, and they smoked marijuana. Two weeks later, defendant called Ms. Roper and said he was going to California.
Ms. Roper testified that she lied during her first interview with Detective Joseph because she was scared. She decided to tell the truth the second time because the detectives told her that they would charge her with accessory after the fact if she did not. When Detective Joseph interviewed defendant a second time, defendant changed his story and claimed that he went to work the night of April 22nd and got off at 4:30 a.m., taking Ms. Roper out of the picture completely.
After the State rested its case, defendant’s mother, Oradel Henderson, testified that, on April 23rd, when she woke up at 5:30 a.m., defendant was at home. She explained that defendant stayed home that day to take care of his | ^handicapped brother while she and her daughter went to church. She further explained that when she got home from church, defendant was at home.
Defendant testified that, on April 22nd, he got off work at 3:00 a.m. and went home and slept. He woke up and cut his mother’s and Ms. Fugate’s grass between 11:30 a.m. and 12:00 p.m. Later on, Ms. Fugate gave him some money. He went to Ms. Roper’s house at 7:00 p.m. and stayed there until 4:30 a.m. Afterwards, defendant left and went to Joy’s Lounge where he stayed for five or ten minutes, and then he went home at 5:00 a.m. When he arrived, he fell asleep on the floor in his brother’s room. Defendant’s mother woke him between 7:30 and 8:00 a.m. before she went to church, and he stayed home with his brother the entire day on April 23rd, as his mother did not get home from church until after 6:00 p.m. Defendant testified that he and Ms. Fugate got along well, that she never called the police to complain about him, and that he did not kill her. He denied having scratches on his arm and telling Ms. Roper that he killed Ms. Fu-gate.

LAW AND DISCUSSION

In his first assignment of error on appeal, defendant complains that the trial court erred in denying his challenges for cause as to two prospective jurors, Paul Roussel, Jr. and Kent Terrio. As a result, he was forced to use peremptory challenges to excuse those individuals, and he ultimately exhausted his 12 peremptory challenges. The State responds that the trial court did not err in denying defendant’s challenges for cause as to the two prospective jurors at issue. The State further responds that the voir dire as a whole was done in a fair and impartial manner and, therefore, the trial court did not abuse its discretion.
Article I, § 17 of the Louisiana Constitution guarantees that “[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” Prejudice is presumed when the trial court erroneously denies a |r,challenge for cause, and the defendant ultimately exhausts his peremptory challenges. State v. Campbell, 06-0286, p. 70 (La.5/21/08), 983 So.2d 810, 856, cert. denied, — U.S. -, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008); State v. Hensley, 04-617, p. 8 (La.App. 5 Cir. 3/1/05), 900 So.2d 1, 8, writ denied, 05-0823 (La.6/17/05), 904 So.2d 683. On appeal, the defendant must show that when the trial court erroneously denied his challenge for cause, he used one of his peremptory challenges curatively to remove that *583 juror, thereby reducing Ms number of peremptory challenges. Campbell, 06-0286 at 71, 988 So.2d at 856.
The record in this case reflects that defendant used peremptory challenges to excuse the two prospective jurors at issue and that he exhausted all of his peremptory challenges. The question on appeal is whether the trial court erroneously denied defendant’s challenges for cause as to those two prospective jurors.
The grounds for a challenge for cause are set out in LSA-C.Cr.P. art. 797 which provides in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court[.]

Prospective juror Paul Roussel, Jr.

Defendant contends that the trial court erred in denying his challenge for cause as to Mr. Roussel, because he was incapable of serving as an impartial juror 17since he admitted that his relationship with the assistant district attorney and two of the investigators would affect his decision. He also asserts that Mr. Roussel was incapable of serving as an impartial juror because he indicated that he would tend to believe a police officer over someone else. The State responds that Mr. Roussel indicated that he could be a fair and impartial juror.
During voir dire, when the trial judge asked whether any of the prospective jurors knew defense counsel, the assistant district attorney (“ADA”), or the two investigators, Mr. Roussel replied that he knew the assistant district attorney, one of the investigators, and one of defendant’s attorneys. The trial judge asked whether his acquaintance with or association with those people would affect his decision, and Mr. Roussel said, “I think it would, I mean, somebody you know.” The trial judge then asked all of the prospective jurors if their relationships with people connected to the case was so strong that they could not treat both sides fairly. For those who wanted to see her privately, the judge advised that they could approach the bench. Mr. Roussel did not respond, nor did he approach the bench.
Afterwards, defense counsel, Mr. Savage, specifically questioned Mr. Roussel, asking him how well he knew the assistant district attorney and the investigators. Mr. Roussel informed Mr. Savage that defendant’s other counsel, Mr. Acosta, went to school with his oldest daughter and that he had known him for “quite a few years.” Mr. Roussel explained that the investigator, Mr. Cupit, and he both had LSU tickets and saw each other routinely. He also explained that Mr. Cupit’s daughter played softball, that he (Mr. Roussel) was a coach, and that he knew them fairly well. Mr. Roussel stated that he and the assistant district attorney in their younger days played ball together and “things like that.” When asked if his relationship with Mr. *584 Cupit or Mr. Acosta would affect his decision in any way for or against the State, Mr. Roussel stated, “That’s hard to say. I mean, it plays on |syour mind, you know. When you’re hearing something from someone you know I think that bears more weight than from somebody you don’t.” Mr. Savage asked Mr. Roussel if that would influence his decision, and Mr. Roussel replied, “I would think it’s definitely in my mind.”
In challenging Mr. Roussel for cause, defense counsel, Mr. Savage, said that Mr. Roussel knew Mr. Acosta, who was one of the defense attorneys, the assistant district attorney, and the investigators. Defense counsel argued that Mr. Roussel had said that those relationships would influence his decision and that it would pray on his mind as to whether he could be fair to one side or the other. The prosecutor responded that Mr. Roussel never said he could not be fair, and that he did not think anything Mr. Roussel said would give rise to a challenge for cause. The trial judge agreed, stating, “I think he was being very candid and said because of who he knew it might play on his mind, he didn’t say pray, he said play on his mind. And we all know, of course that that’s going to, to play some role but it’s not worthy of a challenge for cause.”
The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. State v. Shelton, 377 So.2d 96, 102 (La.1979). The Louisiana Supreme Court succinctly summarized the law on challenges for cause based on a relationship in State v. Anthony, 98-406, p. 24 (La.4/11/00), 776 So.2d 376, 392, cert denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258, (2000) as follows:
... [T]he mere relationship between the prospective juror and the district attorney does not ipso facto disqualify him from service. The defendant may only challenge the juror if his relationship is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict. The facts must reasonably lead to the conclusion that the | nreIationship would influence the juror in arriving at a verdict. A challenge for cause should be granted, even if the juror declares an ability to remain impartial, when the juror’s responses reveal facts from which bias, prejudice, or impartiality may be reasonably inferred. [Internal citations omitted.]
A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. An appellate court does not have the benefit of observing the potential jurors in person to assess the facial expressions and intonations in voice as they answer questions. State v. Bozeman, 03-897, p. 4 (La. App. 5 Cir. 1/27/04), 866 So.2d 1029, 1032, writ denied, 04-0497 (La.7/2/04), 877 So.2d 141. Therefore, this court will not disturb such a decision by the trial judge unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Williams, 02-1188, p. 5 (La.App. 5 Cir. 4/8/03), 846 So.2d 22, 28.
In the instant case, the prospective juror, Mr. Roussel, indicated that he thought his relationships with defense counsel, the ADA, and one of the investigators would influence him, but he did not say whether they would influence him either toward the State or the defense. Additionally, when the trial judge asked the prospective jurors whether there was anyone who could not follow the law, Mr. Roussel did not respond. Mr. Roussel also did not re *585 spond when the trial judge asked the prospective jurors whether there was anyone who could not hold the State to its burden of proof, give the defendant the presumption of innocence, find him not guilty if the case was not proven beyond a reasonable doubt, or not hold it against the defendant if he chose not to testify. Further, Mr. Roussel did not respond when the trial judge asked whether there was any reason that the prospective jurors could not be fair to both sides. Mr. Roussel noted that he had previously served as an alternate juror in another criminal case.
|10The Louisiana Supreme Court made it clear in State v. Kang, 02-2812, p. 8 (La.10/21/03), 859 So.2d 649, 655, that courts of appeal, are to give proper deference to the trial court’s findings with respect to voir dire, and that a prospective juror’s responses during voir dire should be viewed as a whole, and not on a piecemeal basis. Viewing Mr. Roussel’s responses as a whole, we do not find that Mr. Roussel reasonably implied bias, prejudice, or inability to render a lawful judgment. Thus, we find that the trial court did not err by denying the challenge for cause of Mr. Roussel based on his relationships with defense counsel, the ADA, and one of the investigators.
Defendant also argues that Mr. Roussel was incapable of serving as an impartial juror because he said he would tend to believe a police officer over someone else.
A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal. State v. Browning, 06-929, pp. 9-10 (La.App. 5 Cir. 4/11/07), 956 So.2d 65, 72. In the instant case, defendant only based his cause challenge of Mr. Roussel on his relationships with the ADA and one of the investigators, and the trial court based its ruling on that argument alone. Accordingly, defendant did not preserve his other argument regarding Mr. Roussel for appeal. Nevertheless, even if we address this argument, it is without merit.
Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror. Kang, 02-2812 at p. 4, 859 So.2d at 652. However, a prospective juror’s seemingly prejudicial response is not grounds for an automatic challenge for cause, and a district judge’s refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and liability to decide the case impartially according to the law and evidence. Id. at 5, 859 So.2d at 653.
In the present case, when Mr. Savage asked the prospective jurors whether they would give more credibility to the testimony of a police officer than a lay witness, Mr. Roussel stated, “You would think you would tend to believe that person before somebody else.” Mr. Savage responded, “And that’s simply because they’re a police officer, correct?”, to which Mr. Roussel said, “You would think.”
In State v. Stein, 04-23, p. 14 (La.App. 5 Cir. 4/27/04), 874 So.2d 279, 289, writ denied, 04-1345 (La.11/8/04), 885 So.2d 1122, the defendant contended that the trial court erred by denying his challenge for cause of a prospective juror, Mr. Vasseur, because he was acquainted with officers who were State witnesses and was biased in favor of police testimony. This Court found that the trial court did not abuse its discretion in denying the challenge, noting that Mr. Vasseur did not say unequivocally that he would give more weight to a deputy’s testimony because he was an officer. He merely said he ‘ “would assume” ’ he *586 would lean toward bélieving the officer was telling the truth. Id. at 18, 874 So.2d at 291.
In the instant case, Mr. Roussel did not unequivocally state that he would believe a police officer over someone else. He merely said “you would think” you would believe a police officer over someone else, similar to Mr. Vasseur in Stein who said he “would assume” he would lean toward believing an officer was telling the truth. Additionally, Mr. Roussel silently acquiesced when he did not respond to the court’s inquiry as to whether there was anyone who could not hold the State to its burden of proof, give defendant the presumption of innocence, or be fair to both sides.
Based on the entirety of Mr. Roussel’s voir dire testimony and the great deference that a reviewing court should accord to trial court decisions regarding 1 ^challenges for cause, we find that the trial judge did not err by denying the challenge for cause of Mr. Roussel. Prospective juror Kent Terrio
Defendant contends that Mr. Ter-rio was incapable of serving as an impartial juror because he expressed his inability to be fair and impartial if defendant did not testify.
During voir dire, the trial judge advised the prospective jurors that defendant had the right not to take the stand. When the trial judge asked them whether they would hold it against the defendant if he did not take the stand, Mr. Terrio stated, “I, I have a problem with that.” The trial judge told him that he may have a natural inclination to want to hear from the defendant, but that there were reasons why the defendant might be advised not to take the stand. When she asked Mr. Terrio if he would follow the law regarding that issue, he said, “I mean, if it happens while I’m on the jury it’s going to put in my mind he’s, he’s going towards the guilty side to me. That’s me.” The trial judge said, “... you ... cannot follow the law as I give it to you then? Is that ... what you’re saying?” Mr. Terrio responded, “I guess.”
When the prosecutor asked Mr. Terrio if he considered himself to be a law abiding citizen, Mr. Terrio responded affirmatively. However, when the prosecutor said, “So, so you don’t have any problems with following the laws of the State of Louisiana?,” Mr. Terrio replied, “Looks like I do for one.” Mr. Terrio also said, “I’m not saying I’m not going to follow it but it’s going to put in my mind more on the guilty side if he doesn’t take the stand. That’s all I’m saying, I mean.” The prosecutor said they were asking the jurors to listen to the evidence, and Mr. Terrio said he would. Thereafter, Mr. Terrio also said, “I’m not saying, if he doesn’t take the stand I’m not saying I’m going to convict him because of that.” He continued, “But I’m just saying it would put a little, like you said, in my mind, |13why are you not taking the stand. You going [sic] to get prison if you get found guilty. If you innocent [sic] why not take the stand and say what you got [sic] to say?”
When the prosecutor asked Mr. Terrio if he could put aside his normal human curiosity and not let that affect his decision, Mr. Terrio replied, “It’s going to be on my mind. If I hear the evidence I’m going to take the evidence into consideration.” The prosecutor again asked Mr. Terrio if he could accept the fact that the burden of proving the case was on the State. Mr. Terrio stated, “I can accept that’s the way it’s got to go but, I mean, like I said, if I’m, if I’m accused of a crime and I’m innocent I’m, I’m shouting to the top of this roof what I got [sic] to say.” He continued, “That’s, that’s just human nature. Correct me if I’m wrong.” The prosecutor explained that sometimes people don’t take *587 the stand because their lawyer tells them not to or there are other considerations not directly having to do with the case. Mr. Terrio stated, “Sure, I guess that’s possible.”
The prosecutor then asked the prospective jurors whether any of them had a problem sitting in judgment on another human being, and Mr. Terrio responded negatively. He also indicated he would follow the court’s instruction that the State had to prove each element of the crime. Afterwards, the following exchange occurred between the judge and Mr. Terrio:
THE COURT:
All right.
Mr. Terrio, to spite your [sic], your inclination to want to hear what the defendant has to say, if I tell you he doesn’t have to take the stand and that’s the law, you’re becoming a judge now, okay, you’re the judge, are you going to follow the law whether you agree with it or not?
MR. TERRIO: Yes.
THE COURT: Okay. You’re sure?
MR. TERRIO: Yes.
| ^Defense counsel subsequently challenged Mr. Terrio for cause, arguing that Mr. Terrio repeatedly told the court he could not follow the law regarding defendant’s right not to testify. The prosecutor responded that Mr. Terrio, in response to a question from the trial judge at the end, said he could be fair. After a discussion, the trial judge denied the challenge for cause as to Mr. Terrio.
A charge of bias may be removed by the rehabilitation of the prospective juror. State v. Chapman, 410 So.2d 689, 695 (La.1981). A trial judge’s refusal to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, on further inquiry or instruction, the juror has demonstrated the willingness and the ability to decide the case impartially according to the law and evidence. State v. Welcome, 458 So.2d 1235, 1241 (La.1983), cert denied, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 152 (1985).
In the instant case, although Mr. Terrio initially said that he had a problem with defendant not testifying, on further inquiry, he demonstrated the willingness and ability to decide the case impartially according to the law and evidence. Therefore, we find that the trial court did not err by denying the challenge for cause of Mr. Terrio.
In his second assignment of error, defendant asserts that the trial court erred by granting the State’s challenge for cause of juror Donrielle Dennis when there were insufficient grounds to excuse this juror, and by granting the challenge outside the presence of defendant.
During voir dire, Ms. Dennis stated that she lived in Laplace and was single with no children. Ms. Dennis did not respond when the trial judge asked the prospective jurors whether there was anyone who could not follow the law as given to them, hold the State to its burden of proof, give the defendant the presumption |1Rof innocence, find him guilty if the case was proven beyond a reasonable doubt, find him not guilty if the case was not proven beyond a reasonable doubt, or not hold it against the defendant if he chose not to testify. Further, Ms. Dennis did not respond when the trial judge asked whether there was any reason whatsoever that the prospective jurors could not be fair to both sides.
Ms. Dennis was subsequently chosen as a juror and sworn in. Shortly thereafter, Ms. Dennis approached the bench and asked the trial judge if she could speak to her “without the defendant.” The trial judge said, “Okay. Will you all excuse the *588 defendant for a minute?” The transcript reflects that defendant stepped back from “side-bar.” Thereafter, Ms. Dennis indicated that she had been feeling increasingly uncomfortable because she had informed them where she lived. The trial judge reminded her that she had not disclosed her address. Ms. Dennis explained that defense counsel had asked previously if the prospective jurors lived on or near Cambridge and she had responded that she only lived a couple of blocks away. When the trial judge asked defense counsel if that was where the crime occurred, he responded affirmatively. The prosecutor also added that it was where defendant lived. Ms. Dennis repeated twice, “I’m not comfortable with that.” The prosecutor asked her if she would be able to sit and listen to the evidence, and Ms. Dennis said that she was distracted at that point and did not know.
Thereafter, the prosecutor challenged Ms. Dennis for cause. He explained that if that testimony had come out during the regular voir dire, he would have made the cause challenge at that time. When defense counsel, Mr. Savage, said he did not understand her point, the prosecutor reiterated that Ms. Dennis lived in close proximity to defendant’s residence and the crime scene. Mr. Savage objected, but the trial judge granted the State’s challenge for cause of Ms. Dennis.
|1fiThe record reflects that Ms. Dennis was very concerned for her safety since she had informed the court that she lived near defendant’s residence and the crime scene. The prosecutor noted, “This woman is freaking out over here.” The trial judge, who had the benefit of observing Ms. Dennis’ facial expressions and intonations in voice, may have been concerned that Ms. Dennis’s impartiality might be affected. We note that the entire jury panel had not yet been selected when Ms. Dennis approached the bench with her concerns.
As stated above, the trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror, and the appellate court will not disturb such a decision unless a review of the voir dire as a whole indicates an abuse of discretion. Williams, 02-1188 at 5, 846 So.2d at 28. Our review of the record does not reveal that the trial judge abused her discretion in granting the challenge for cause of Ms. Dennis.
Defendant further argues that the trial court erred by granting the State’s challenge for cause of Ms. Dennis outside his presence.
LSA-C.Cr.P. art. 831 A(3) generally provides that a defendant charged with a felony shall be present at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror. Nevertheless, the right conferred by LSA-C.Cr.P. art. 831 A(3) is not absolute and may be tempered by exigent circumstances arising at trial. State v. Hampton, 98-2605, p. 2 (La.5/28/99), 737 So.2d 699, 700. In addition, an accused may waive his presence by not objecting to his absence from an Article 831 A(3) hearing, as required under the general contemporaneous objection rule. LSA-C.Cr.P. art. 841.
In the instant case, neither defense counsel nor defendant lodged a contemporaneous objection to defendant’s exclusion from the bench conference. [ 17LSA-C.Cr.P. art. 841. As such, the issue was not preserved for appeal. However, even if we consider defendant’s argument, it is without merit.
In State v. Hampton, 99-2605 at 1, 737 So.2d at 700, the trial court excluded the defendant from a meeting in chambers *589 during which a juror expressed anxiety over the possibility that defendant “might come after” her or “get somebody to come” after her if he was found guilty. After a colloquy in which defense counsel participated, the trial court allayed the juror’s fears and retained her on the panel over defense objection. The Louisiana Supreme Court found that defendant’s presence in chambers would likely have forestalled any inquiry into the juror’s emotionally charged concerns and would thereby have thwarted, not advanced, the purpose of the hearing to determine the juror’s fitness to continue on the panel. The Court noted that the trial court made sure of counsel’s presence to protect defendant’s interests and found that, under the circumstances, there was no reversible error in excluding defendant as a matter of trial exigency. Id., 98-2605 at 1-4, 737 So.2d at 700-701.
In the instant case, defense counsel participated in the bench conference during which Ms. Dennis expressed anxiety over concerns for her safety since she had informed the court that she lived in close proximity to the crime scene and defendant’s residence. As in Hampton, if defendant had been present at that bench conference, it would likely have forestalled any inquiry into the juror’s emotionally charged safety concerns and would thereby have thwarted, not advanced, the purpose of the hearing. Additionally, as in Hampton, defense counsel was present at the bench conference to protect defendant’s interests. In light of the foregoing, we find that the trial court did not err by meeting with Ms. Dennis outside the presence of defendant and subsequently granting the State’s challenge for cause. Accordingly, this assignment of error is without merit.
11¡¡In his third assignment of error, defendant argues that the trial court erred by excusing Dynell Cook from the jury on the second day of trial. He contends that although Mr. Cook asserted that he recognized defendant’s mother, he stated that this would not affect his ability to be fair and impartial.
The record reflects that the jury panel was sworn, the indictment was read, and the trial judge made comments to the jury. The prosecutor and defense counsel then gave opening statements. The next day, the trial judge asked that they convene outside the presence of jury, except for Mr. Cook. The trial judge informed everyone that the day before, after everyone had left the courtroom, she received information from the bailiff that Mr. Cook wanted to talk to her about a problem, and she asked that it wait until the next day. Mr. Cook then stated that he wanted to let the court know that he recognized defendant’s mother because her sister lived across the street from his mother. Mr. Cook stated that he realized this the day before when they all came back in as a panel and heard the attorneys give their opening statements. Mr. Cook insisted, however, that he had never met defendant’s mother. When the trial judge asked if the fact that he had seen defendant’s mother would interfere with his ability to be fair and impartial, he responded negatively.
After Mr. Cook exited the courtroom, the prosecutor said that he needed to be removed from the jury, because a potential juror who was familiar with the defendant or any member of his family was a very important consideration to the State in exercising its peremptory challenges. He noted that he could think of at least seven people he used his peremptory exceptions on that he would have let stay on the jury before accepting Mr. Cook. The prosecutor concluded by saying that he was denied his ability to use his peremptory exceptions *590 because of Mr. Cook’s lack of forthrightness at the time of jury selection. Defense counsel |iaobjected to Mr. Cook’s removal, noting that Mr. Cook did not even realize who. defendant’s mother was until he saw her at the end of the day. He argued that the relationship was too tenuous to remove Mr. Cook and that Mr. Cook had said he could still be fair.
The trial judge said what bothered her was that defendant’s mother was sitting on the left side of the courtroom the entire day before within Mr. Cook’s view while he was being questioned. She did not know what happened to make Mr. Cook suddenly tell them that he knew who defendant’s mother was. The trial judge seemed disturbed that Mr. Cook never met the woman other than seeing her somewhere, but he now knew that she was defendant’s mother. The trial judge agreed with the prosecutor that he probably would have challenged Mr. Cook if given the chance to do so. She then stated that she was going to remove Mr. Cook and replace him with an alternate, and defense counsel noted his objection.
If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course. LSA-C.Cr.P. art. 796. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. LSA-C.Cr.P. art. 789.
In State v. Derouselle, 99-3283 (La.4/28/00), 761 So.2d 1269, the trial court learned on the second day of trial that a juror had failed to reveal a potential source of bias during voir dire, despite questions specifically designed to elicit the information as an aid to the State’s exercise of its challenges. The Louisiana Supreme Court held that the trial court had the discretion to replace a juror with an alternate upon finding that the juror had become unable to perform or disqualified from performing his or her duty under LSA-C.Cr.P. art. 789. The Court noted that | j>nthe trial court expressed doubts about the candor and veracity of the juror and concluded that, under these circumstances, removing the juror because of doubts raised by her lack of candor under oath about her competency to serve impartially, and replacing the juror with an alternate, represented the proper exercise of the trial court’s discretion. Id., 99-3283 at 1-2, 761 So.2d at 1270.
In the instant case, as in Derouselle, the juror at issue failed to reveal a potential source of bias during voir dire despite questions designed to elicit information as an aid to the State’s exercise of its peremptory and cause challenges. In both cases, the prosecutors were frustrated because they said they would have excused those jurors had they known that information. In this case, as in Derouselle, the juror shared that information with the court on the second morning of trial. Also, the trial judges in both cases expressed doubts about the candor and veracity of the jurors for their failure to reveal potential biases.
Considering the foregoing, we find that the trial court did not err in dismissing Mr. Cook from the jury and replacing him with an alternate. Based on the caselaw, removing Mr. Cook because of doubts raised by his lack of candor under oath about his ability to serve impartially, and replacing him with the alternate, was a proper exercise of the trial court’s discretion. Accordingly, this assignment of error is without merit.
In his fourth assignment of error, defendant contends that the trial court *591 erred by charging the jury on the crimes of rape, robbery, and kidnapping because there was no evidence to support these crimes. The State responds that, although some jury instructions at issue were read by mistake, that alleged error had no effect on the jury’s verdict given the overwhelming weight of the evidence.
Prior to trial, defendant filed a motion for bill of particulars asking if the State intended to prove at trial certain felonies listed in the first degree murder | g1 statute, including aggravated kidnapping, second degree kidnapping, armed robbery, first degree robbery, and simple robbery. The State indicated in its response that it only intended to prove that defendant was engaged in armed robbery at the time of the offense.
When the trial judge read the amended indictment to the jury at the beginning of trial, she read the entire second degree murder statute, including every enumerated felony listed in LSA-R.S. 14:30.1 A(2)(a).[1] However, she said that they would limit the felonies listed in that statute to the appropriate ones later on. During opening statements, the prosecutor said that he had to prove that defendant either intended to kill or inflict great bodily harm, or that defendant killed the victim during an armed robbery, an attempted rape, or an aggravated burglary.
After court was adjourned on the second day of trial, a charge conference was held. During that conference, the trial judge, defense counsel, and the prosecutor discussed removing the sections of the second degree murder statute that were inapplicable to the instant case. The prosecutor argued that perpetration or attempted perpetration of aggravated rape was applicable; however, defense counsel disagreed, asserting there was no evidence that a rape occurred. The prosecutor mentioned that the victim’s shirt was lifted up and her breasts were exposed, as evidence of an attempted rape. The prosecutor indicated it was up to the jury to decide whether attempted rape was proven, and the trial judge agreed.
The prosecutor argued that the entire second degree murder statute could be read to the jury, but, for judicial economy, he was willing to remove some sections, 122Íncluding aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, cruelty to juveniles, and terrorism. He said, however, that he wanted all the robberies to remain. Defense counsel objected to the rapes and robberies being included. The trial judge noted his objection, but stated that there was some testimony regarding those crimes and, therefore, it was a jury call.
During closing argument, the prosecutor argued that the evidence showed defendant had the intent to kill or to inflict great bodily harm. He also argued that, even if the jury did not find that he did, they could still find him guilty of second degree murder, since there was evidence that he committed aggravated burglary, an armed robbery by taking the victim’s car, or possibly an attempted rape.
After closing arguments, the trial judge read the jury instructions to the jury. During the reading of the second degree *592 murder statute, the trial judge stated, among other things, that second degree murder was the killing of a human being when the offender was engaged in the perpetration or attempted perpetration of aggravated or forcible rape, aggravated burglary, armed robbery, first and second degree robbery, or simple robbery, even if defendant had no intent to kill or inflict great bodily harm. The definitions of those crimes were read as well. However, when the trial judge gave additional instructions, she stated:
Or in order to convict the defendant of second degree murder, you must find:
That the defendant killed the victim while engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated burglary, aggravated kidnapping, second degree kidnapping ...
Thus, the trial judge added the crimes of aggravated kidnapping and second degree kidnapping when she read this part of the jury instruction.
An erroneous jury instruction is subject to harmless error review. State v. Eskano, 00-101, p. 15 (La.App. 5 Cir. 1/30/01), 779 So.2d 148, 155. The | ¡^appropriate standard for determining harmless error is “not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the instant trial was surely unattributable to the error.” Id.
In the instant case, even if the trial judge erred by charging the jury on the crimes of rape, robbery, or kidnapping, any error was harmless. The record shows that the guilty verdict was amply supported by the evidence, and the jury charge did not contribute to the verdict. The extent and severity of the victim’s injuries showed that defendant had the specific intent to kill or inflict great bodily harm. Additionally, there was ample evidence of aggravated burglary.[2] Accordingly, this assignment of error is without merit.
In his final assignment of error, which he raises pro se, defendant argues that the trial court erred by allowing the jury’s non-unanimous verdict of 11 to one.
LSA-C.Cr.P. art. 782 provides in pertinent part that “[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to reach a verdict.” In State v. Belgard, 410 So.2d 720, 726 (La.1982), the Louisiana Supreme Court explained that the United States Supreme Court has upheld the validity of non-unanimous jury verdicts for 12-person juries, and that “[t]his court has consistently held C.Cr.P. 782 does not violate the Sixth or Fourteenth Amendments to the United States Constitution.” Recently, in State v. Bertrand c/w State v. Chretien, 08-2215 c/w 08-2311, pp. 9-10 (La.3/17/09), 6 So.2d 738, the Louisiana | ¡.¿Supreme Court reversed the district court, which had held Article 782 was unconstitutional, and stated:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States *593 Supreme Court’s still valid determination that non-unanimous 12 person jury-verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Based on the foregoing, the trial court did not err by allowing the jury’s non-unanimous verdict of 11 to one. Thus, this assignment of error is without merit.

ERRORS PATENT

The record was reviewed for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors patent.

DECREE

For the foregoing reasons, we affirm defendant’s conviction and sentence.

AFFIRMED.

. LSA-R.S. 14:30.1 A(2)(a) provides that second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

. LSA-R.S. 14:60 provides in pertinent part that, "Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.