# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-700

STATE OF LOUISIANA

VERSUS

DAVID G. SARPY

************

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 13323
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

************

## DAVID E. CHATELAIN*
## JUDGE

************

Court composed of Jimmie C. Peters, James T. Genovese, and David E. Chatelain, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

Van Hardin Kyzar
District Attorney
Billy J. Harrington
Assistant District Attorney
Post Office Box 838
Natchitoches, Louisiana  71458-0838
(318) 357-2214
Counsel for:
	State of Louisiana

Peggy J. Sullivan
Louisiana Appellate Project
Post Office Box 2806
Monroe, Louisiana  71207-2806
(318) 387-6124
Counsel for Defendant/Appellant:
	David G. Sarpy

---

*Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**CHATELAIN, Judge.**

In this criminal case, David G. Sarpy (hereafter the defendant) appeals his jury convictions for second degree murder, a violation of La.R.S. 14:30.1, and attempted second degree murder, a violation of La.R.S. 14:30.1 and La.R.S. 14:27. For reasons that follow, we affirm the defendant's convictions and sentences and instruct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8.

## FACTS AND PROCEDURE

Between 5:00 and 5:30 a.m. on June 26, 2005, the defendant broke into the home of Timothy and Melinda Mitchell in Natchitoches Parish. The defendant gained entry into the Mitchells' home through a wooden kitchen door that had multiple glass panes near the top of the door. Several of the glass panes had been removed from the door, and pruning shears were used to cut through the wooden slats. Once inside the home, the defendant entered the bedroom of Tyler, the Mitchells' fifteen-year-old son, and started choking him. In the course of the struggle, Tyler scratched the defendant. Melinda awakened Timothy when she heard Tyler struggle, and, on Timothy's suggestion, Melinda left the house, hid in a nearby field, and called 911 while he investigated the noise they heard. When Timothy entered Tyler's room, the defendant fired three .22 caliber bullets into Timothy's chest; Timothy died as a result of his injuries. Before fleeing, the defendant shot Tyler twice, once in the left, upper back and once just above one of his knees;[1] Tyler recovered from his injuries. The Mitchells' other son, Jordan, was not harmed. The defendant fled the scene.

---

[1]Investigators found evidence of six shots: five struck the two victims and a sixth shot strayed and impacted a wall located in the hall.

After personnel with the Natchitoches Parish Sheriff's Office secured the crime scene, persons with the Louisiana State Police Crime Lab (hereafter the Crime Lab) took photographs and collected fingerprint evidence.[2] At the direction of Charles A. Curtis, Jr., the Natchitoches Parish Coroner, Ruth Hubbard, a forensic nurse, took swab samples from Tyler's neck and shoulders (where the defendant attempted strangulation) and removed scrapings from under Tyler's fingernails. Crime Lab personnel documented the following items that were left in Tyler's room: a black do-rag;[3] a pair of brown shoes, which did not belong to the Mitchells; rolling paper; and the red-handled pruning shears used by the defendant to enter the Mitchells' home.

These crimes remained unsolved for approximately two years. After eliminating several individuals as suspects through the use of DNA analysis, street talk led the investigators to the defendant. At the request of the Natchitoches Parish Sheriff's Office, deputies in Rapides Parish collected a DNA sample from defendant; that sample was returned to Natchitoches Parish and was delivered to the Crime Lab for analysis. In due time, Marcy Herndon, an expert DNA analyst with the Crime Lab, matched the defendant's DNA sample to the DNA evidence found in the fingernail scrapings taken from Tyler's left hand.

After receiving information about the defendant's possible involvement in these crimes, Victor Jones, the Natchitoches Parish Sheriff, and Travis Trammell, Jr., a detective with the Natchitoches Parish Sheriff's Office who was responsible for the investigation of these crimes, interviewed the defendant on August 6, 2007, in Rapides Parish. At 1:15 p.m., the defendant signed a form acknowledging his

---

[2]Although numerous fingerprints were obtained at the crime scene, Julie Bergen, an expert in latent fingerprint analysis who worked for the Crime Lab, testified that all latent fingerprints that could be identified belonged to members of the Mitchell family.

[3]Testimony at trial described a do-rag as a spandex head sock.

*Miranda*[4] rights and indicated that he read a statement of his rights, that he understood those rights, and that he was willing to make a statement and answer questions. He further indicated that he did not want a lawyer at that time and that no promises or threats and no pressure or coercion was used against him. In fact, Detective Trammel stated that the defendant "wondered what took us so long to, to be coming to see him." Thereafter, the defendant confessed to the murder of Timothy Mitchell and the shooting of Tyler Mitchell.

Approximately an hour later, at 2:14 p.m., the defendant again signed a form acknowledging his *Miranda* rights and a waiver thereof identical to that signed earlier. The defendant then provided a tape-recorded statement in which he detailed the crimes.[5] In his taped confession, which consisted of questions and answers, the defendant said that: (1) he broke a window in a door on the back porch of the Mitchell residence to gain entry to the house; (2) he used something he found lying right down beside the door to break the window; (3) he randomly picked this house; (4) he did not know the Mitchells and did not think anyone was home; (5) he "went in there to steal stuff"; (6) he went into one of the rooms in the house and started wrestling with an individual who surprised him in the house, and he was scratched around his shoulders during the struggle; (7) he shot another individual who came into the room where he was wrestling; (8) he did not remember if he shot anyone else before he ran out the house and did not know how many times he shot; (9) he used a gun that he had "stolen . . . out of somebody's house" about a month before and he

---

[4]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

[5]The defendant moved to suppress his confession on November 14, 2008. After conducting an evidentiary hearing on December 4, 2008, the trial court denied the defendant's motion. Although the defendant assigned as error the trial court's failure to suppress his confession in the appeal now before us, he failed to brief that assignment of error. Assignments of error not briefed are considered abandoned. Uniform Rules—Courts of Appeal, Rule 2–12.4.

threw the gun into the river when he fled; (10) he left shoes behind at the Mitchell home and he probably got those shoes from a house he had broken into earlier; and (11) he had parked his car alongside a corn field on the right side of Fish Hatchery Road, just past the Mitchell home, and he fled in the car and went to his cousin's house in Melrose.

On August 15, 2007, a grand jury indicted the defendant with first degree murder, a violation of La.R.S. 14:30, and attempted first degree murder, a violation of La.R.S. 14:30 and La.R.S. 14:27. The defendant entered a plea of not guilty to both charges on November 7, 2007. Subsequently, on April 21, 2008, the State filed a notice of waiver of the death penalty. Thereafter, on October 5, 2009, the State amended the indictment to charge the defendant with second degree murder, a violation of La.R.S. 14:30.1, and attempted second degree murder, a violation of La.R.S. 14:30.1 and La.R.S 14:27. The defendant then entered a plea of not guilty to both charges.

Jury selection commenced on October 5, 2009, and on October 8, 2009, the jury found the defendant guilty as charged on both counts. On January 6, 2010, the trial court sentenced the defendant to serve life imprisonment for second degree murder and fifty years at hard labor for attempted second degree murder. The trial court ordered the sentences served consecutively and without benefit of probation, parole, or suspension of sentence. A motion to reconsider sentence was filed on January 29, 2010, and was subsequently denied.

An appeal was granted in this matter on February 18, 2010. The defendant is now before this court presenting five assignments of error: 1) the evidence was insufficient to support the convictions of second degree murder and attempted second

4

degree murder; 2) the maximum sentence of fifty years on the charge of attempted second degree murder and the consecutive nature of the sentences were excessive under the circumstances; 3) it was error for the trial court to allow evidence of his previous convictions for simple burglary to be admitted at trial; 4) it was error for the trial court to deny his *Batson*[6] challenge during voir dire; and 5) it was error for the trial court to deny defense counsel's challenges for cause as to three jurors:  Bobby McPhearson, Stacy Trichel, and Lanette Nichols.

## *ERRORS PATENT REVIEW*

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record.  After reviewing the record, there is one error patent.

Our careful review of the record shows that the trial court failed to advise the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8.  Thus, we direct the trial court to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.  *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## *SUFFICIENCY OF THE EVIDENCE*

In his first assignment of error, the defendant contends the evidence was insufficient to support his convictions for second degree murder and attempted second degree murder.  The defendant's arguments are that the State failed:  (1) to negate the probability of DNA transfer from the do-rag to Tyler's fingernails; (2) to

---

[6]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

5

prove the defendant was the sole intruder;[7] (3) to negate any reasonable probability

of misidentification; (4) to explain how the defendant's conduct was consistent with

a burglary; and (5) to produce the murder weapon.

> In evaluating the sufficiency of the evidence to support a
> conviction, a reviewing court must determine whether, viewing the
> evidence in the light most favorable to the prosecution, any rational trier
> of fact could have found proof beyond a reasonable doubt of each of the
> essential elements of the crime charged. *Jackson v. Virginia,* 443 U.S.
> 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d
> 676, 678 (La.1984). Additionally, where circumstantial evidence forms
> the basis of the conviction, the evidence must exclude every reasonable
> hypothesis of innocence, "assuming every fact to be proved that the
> evidence tends to prove." La. R.S. 15:438; *see State v. Neal,* 2000-0674
> p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied,* 535 U.S. 940, 122
> S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of
> La.R.S. 15:438 "works with the *Jackson* constitutional sufficiency test
> to evaluate whether all evidence, direct and circumstantial, is sufficient
> to prove guilt beyond a reasonable doubt to a rational jury." *Neal,* 2000-
> 0674 p. 9, 796 So.2d at 657.

*State v. Draughn*, 05-1825, p. 7 (La. 1/17/07), 950 So.2d 583, 592, *cert. denied*, 522

U.S. 1012, 128 S.Ct. 537 (2007).

> When the key issue is not whether a crime occurred, but rather,
> the identity of the perpetrator, the state is required to negate any
> reasonable probability of misidentification. *State v. Hughes,* 05-992
> (La.11/29/06), 943 So.2d 1047. One witness's positive identification is
> sufficient to support a conviction. *Id.*

*State v. George*, 09-143, p. 5 (La.App. 3 Cir. 10/7/09), 19 So.3d 614, 618.

---

[7]In argument to this court, defendant further contends that defense counsel's cross-examination of Detective Trammell was erroneously curtailed. Our review of the record shows that defense counsel questioned Trammell regarding Melinda Mitchell and was asked the following: "What about any other affairs that she may have had with different individuals other than her husband?" The State objected to the question and asserted that any such information was not relevant. The trial court sustained the State's objection and ruled the information was not relevant. The defendant has not asked this court to review the trial court's evidentiary ruling. Accordingly, the correctness of the trial court's evidentiary ruling is not before us. We further note that defense counsel commented during the discussion regarding the relevancy of his question wherein he indicated that an insurance policy had been taken out right before Timothy's death. There was no evidence presented to support this assertion.

From the outset, we point out that the jury heard the tape-recorded statement of the defendant in which he established his sole presence at the Mitchell home and detailed his actions that night. Notwithstanding that evidence, we have carefully reviewed this record, examined the defendant's contentions, and detail the other evidence the jury considered as it deliberated the question of whether the State proved beyond a reasonable doubt that the defendant was guilty of second degree murder and attempted second degree murder.

The defendant contends the State failed to prove beyond a reasonable doubt that he committed the murder of Timothy Mitchell and the attempted murder of Tyler Mitchell. Although the defendant asserts the DNA under Tyler's fingernails may be direct evidence placing him in contact with the victims, he nonetheless contends the State failed to negate the probability of transfer of DNA from the do-rag to Tyler. In particular, the defendant contends that the presence of his DNA on the do-rag is inconclusive because someone could have taken the do-rag and worn it after he had done so.

Tyler testified that a person whom he could not identify entered his bedroom and started choking him. During the struggle, he scratched that person. His father, Timothy, eventually entered the room. The intruder then shot Timothy and Tyler and ran. Tyler testified that neither the shoes nor the do-rag found by police in his bedroom belonged to any member of his family. Tyler further testified that the do-rag was not in his bedroom when he fell asleep. Likewise, Melinda and Jordan testified that neither the brown shoes nor the do-rag found inside the home belonged to any member of their family.

7

Our review of the record shows that there was no evidence presented to suggest that someone else wore the do-rag after the defendant had done so, that Tyler touched the do-rag, or that somehow the defendant's DNA was transferred to the do-rag. The record is void of any testimony regarding the transfer of DNA from the do-rag to Tyler's fingernails. Although the defendant's fingerprints were not found in the residence, the evidence is clear that the DNA recovered from underneath Tyler's fingernails belonged to the defendant. More importantly, the jury heard the defendant's statement to the investigators that he was present in the Mitchell home that night and that he thought that he was scratched during the struggle in Tyler's bedroom.

Herndon was qualified as an expert in DNA analysis. Herndon testified that two people contributed DNA to the do-rag found at the Mitchell home. The defendant could not be excluded as the major contributor. Herndon further testified that she could not draw conclusions about the DNA found on the shoes found in Tyler's room. Although she stated that the right shoe contained a DNA mixture from three people and the left shoe contained the DNA of two contributors, she could not draw any DNA conclusions on this item of evidence.[8]

Herndon further testified that Tyler was the major contributor of DNA in fingernail scrapings taken from his right hand and that his father was the minor contributor. However, she testified that the DNA from fingernail scrapings removed from Tyler's left hand came from a single source and was consistent with that of the defendant.

---

[8]Considering the defendant's oral statement that he acquired these shoes in an earlier burglary some months prior, it is understandable that the shoes contained a DNA mixture. Again, it is quite telling that the jury heard the defendant say in his tape-recorded statement that he left those shoes in the Mitchell home when he fled.

In summation, Herndon discussed the mathematical probability of finding the defendant's DNA in the fingernail scrapings removed from Tyler's left hand and the inner and outer parts of the do-rag found in Tyler's bedroom. Based upon her DNA analysis, Herndon opined that the probability of finding the same DNA profile from a randomly-selected individual other than the defendant was approximately "1 in 2.09 trillion."

The defendant next contends that the State failed to prove he was the sole intruder. Although Melinda did not see the perpetrator leave and did not know if there was only one intruder, the evidence does not support the defendant's contention. Tyler testified that, until his father entered the room, only one other person was in his room. Moreover, Jordan testified that just after he heard gunshots followed by his father's scream, a silhouette, which he could not identify, looked into his bedroom and left. Jordan's testimony was unrefuted that he saw only one perpetrator in the home that morning. Again, in his tape-recorded confession, the defendant never spoke of any other person who accompanied him in the Mitchell home invasion.

In further argument, the defendant contends the State failed to negate any reasonable probability of misidentification. In support of his argument, the defendant argues that no member of the Mitchell family identified the defendant as the perpetrator and that Tyler's description of the perpetrator as big is not supported.[9] Why the family members were not able to describe the perpetrator with any accuracy is well understood because these crimes took place during a violent home invasion in the early morning when it was dark. Moreover, the State's introduction of the

_____

[9]Defense counsel stressed Tyler's estimation of the perpetrator's height. Using himself as an example, defense counsel stated that he was five feet seven inches tall; according to defense counsel, the defendant was shorter that he.

defendant's free and voluntary confession and its presentation of expert scientific evidence establishing the defendant's presence through independent DNA analysis speak volumes as to the State's discharge of its burden of negating the reasonable probability of misidentification.

The defendant next argues that the State failed to produce the murder weapon. It is well settled that there is nothing in the second degree murder statute that requires the State to produce the murder weapon in order to meet its burden of proof at trial. *State v. Knight*, 09-359 (La.App. 5 Cir. 2/9/10), 34 So.3d 307. Moreover, not to be overlooked is the defendant's statement to Detective Trammel that he disposed of the gun in the river near his cousin's house in Melrose. As Detective Trammel told the jury, it would be nearly impossible to locate a weapon in the river because it is not known exactly where the weapon was disposed of, and a weapon would become lost in the muddy bottom of the river.

Finally, the defendant contends the State failed to explain how the defendant's conduct was consistent with a burglary. Defendant's own words, as played to the jury, belie his argument: he stated that he was driving and simply picked the Mitchells' home because he thought no one was there; although he "went there to steal stuff[,] . . .[he] never got the chance." As to why the defendant would have begun his burglary with an assault, again we point out that the jury heard the defendant's own statement that he thought no one was in the Mitchell home. It would have been reasonable and fully supported by the evidence for the jury to conclude that the defendant became startled when he discovered Tyler, and he reacted to that discovery in a violent manner.

_____The defendant confessed to the commission of the offenses. Further, his DNA was present on the do-rag found in Tyler's bedroom and in scrapings taken from Tyler's fingernails. Viewing the evidence in a light most favorable to the prosecution, we find that the State proved beyond a reasonable doubt that the defendant committed the offenses at issue. Accordingly, this assignment of error lacks merit.

## *OTHER CRIMES EVIDENCE*

The defendant contends it was error for the trial court to allow evidence of his previous convictions for simple burglary to be admitted at the trial of this matter.

On February 21, 2008, defense counsel filed a "PRIEUR[10] DEMAND FOR NOTICE OF ALL BAD ACTS THAT MAY BE USED AGAINST DAVID SARPY AT HIS TRIAL." The State filed a *Prieur* Notice on March 13, 2008. Therein, the State gave notice of its intent to offer evidence of the following crimes or wrongful acts under La.Code Evid. art. 404(B) to prove motive, opportunity, and intent:

(a)     Case #: C8741, 10th Judicial District Court
        Charge: Simple Burglary (2 counts)
        See Case File attached as Exhibit "A"

(b)     Case #: C7976B, 10th Judicial District Court
        Charge: Simple Burglary
        Date of Offense: July 10, 2003
        See Case File attached as Exhibit "B"

On the day jury selection began, the State noted there was a discussion during pre-trial, and the parties sought a ruling from the court on the *Prieur* notice. Defense counsel stated that he had reviewed the record during the week prior to trial, and, because there was no ruling on the notice, he prepared for trial expecting there would be no testimony regarding the defendant's prior simple burglaries. He then objected

---

[10]*State v. Prieur*, 277 So.2d 126 (La.1973).

11

to the introduction of the evidence. The trial court found that prior crimes of simple

burglary would "clearly have something to do with . . . this kind of crime." Thus, the

trial court found that defendant's prior convictions for simple burglary were

admissible. Defense counsel objected, noting the hearing on the *Prieur* notice should

have taken place before the day trial was to commence. He further objected to the

trial court's ruling.

Nevertheless, during trial, the following occurred:

MR. HARRINGTON [District Attorney]: Also, Your Honor we would like to make a joint stipulation the defendant David Sarpy had been previously convicted on two counts of Simple Burglary under docket number 8741 in Natchitoches Parish on April 4, 2005.

MR. WASHINGTON [Defense Counsel]: That's correct.

In brief to this court, the defendant asserts that the trial court conducted no

hearing, and its ruling was devoid of any finding that the evidence at issue was

admissible under a specific exception provided by La.Code Evid. art. 404(B). The

defendant further asserts that he demonstrated prejudice from the lack of a timely

ruling on the notice, as defense counsel prepared for trial under the misunderstanding

that the State would not use evidence of other crimes.

Generally, to preserve an issue for appeal, a party need not enter a contemporaneous objection to the court's ruling on a written motion. LSA-C.Cr.P. art. 841B. However, where a defendant initially files a pre-trial motion objecting to the introduction of certain evidence, if at trial he specifically agrees to the introduction, he has waived his prior objection and loses the right to present the issue on appeal. *State v. Gaal*, 01-376, p. 22 (La.App. 5 Cir. 10/17/01), 800 So.2d 938. *See also*: *State v. Butler*, 30,798 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, 894, *writ denied*, 98-2217 (La.1999), 734 So.2d 1222; *State v. Dillon*, 93-707 (La.App. 5 Cir. 1/24/94), 631 So.2d 1171.

*State v. Onezime*, 01-1018, p. 16 (La.App. 5 Cir. 2/26/02), 811 So.2d 1033, 1043, *writ*

*denied*, 02-1099 (La. 3/21/03), 840 So.2d 535.

We further observe that in *State v. Kennedy*, 05-1981 (La. 5/22/07), 957 So.2d 757, *reversed on other grounds sub nom. Kennedy v. Louisiana*, __ U.S. __, 128 S.Ct. 2641 (2008), the defendant raised several issues regarding his right to confrontation arising from the admission of the victim's videotaped interview, in which the victim accused the defendant of raping her. During its discussion regarding the admissibility of the videotape, the supreme court stated the following:

> [W]e note that the defendant stipulated to the admissibility of the tape before it was played and expressly stated that he had "no objection to the tape." Even after the cross-examination, he still did not object on the grounds that the victim's alleged lack of memory rendered her unavailable. Thus, this objection is clearly waived. La.C.Cr.P. 841.

*Id.* at 777.

Although defense counsel initially objected to the trial court's ruling that evidence of the defendant's prior convictions for simple burglary was admissible, he then entered a joint stipulation regarding those offenses at trial. Therefore, we find that the defendant waived any objection to the admissibility of the evidence at issue.

## *BATSON OBJECTION*

The defendant next contends it was error for the trial court to deny his *Batson* challenge during voir dire. The defendant's objection focused solely on prospective juror Mary Taylor.

> In *Batson*, the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. The Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection clause of the 14th Amendment in *Miller-El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the *Batson* ruling in LSA-C.Cr.P. art. 795.[6] *See also State v. Snyder,* 1998-1078 (La.9/6/06), 942 So.2d 484, rev'd on other grounds, *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).
>
> If the defendant makes a *prima facie* showing of discriminatory

13

strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the *Batson* analysis, whether the defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible. *Rice v. Collins,* 546 U.S. 333, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006), quoting *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. *State v. Tyler,* 97-0338, at 3 (La.9/9/98), 723 So.2d 939, 942, *cert. denied,* 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999).

The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. *Id.* at 4; see also, *State v. Juniors,* 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a *Batson* objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339, 123 S.Ct. at 1040.

The three-step *Batson* process which guides the courts' examination of peremptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the

14

opponent of the strike. [Internal quotations and citations omitted.]

*Collins,* 546 U.S. at 338, 126 S.Ct. at 973-74.

---

[6]LSA-C.Cr.P. art. 795(C): No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

*State v. Anderson*, 06-2987, pp. 41-43 (La. 9/9/08), 996 So.2d 973, 1004-05, *cert. denied*, __ U.S. __, 129 S.Ct. 1906 (2009).

Defense counsel raised a *Batson* objection when the State exercised a peremptory challenge to prospective juror Mary Taylor. When making that objection, defense counsel asserted the State had used seven of the nine peremptory challenges it had exercised to strike black prospective jurors. The State then asserted that it attempted to exclude Taylor for the following reasons:

> One she was divorced. That bothered me a little bit because I've got, we've got a home invasion here and she's a divorced woman and we've got a family that we're dealing with in this house, a very close knit family that the Court will hear from and I think her being divorced was bothering me. Also she does not own her house. This is a home invasion case where the defendant went into the victim's home without any authority, committed a murder therein also shot the child, choked the child and it supported the home issue.

The trial court maintained that the State had asked "every juror from the time we started whether they own their house. So that must be a factor that he believes is important." Thus, the trial court then found the State's asserted reason was race neutral.

In brief to this court, the defendant asserts there is no need for this court to determine whether defense counsel established a *prima facie* case of purposeful discrimination because once a trial court requires a party to provide race neutral

15

reasons for its use of a peremptory challenge and the trial court has ruled on the issue, the issue of whether a *prima facie* showing was made is moot. *See State v. Allen*, 03-2418 (La. 6/29/05), 913 So.2d 788, *cert. denied*, 547 U.S. 1132, 126 S.Ct. 2023 (2006). We agree.

The defendant contends the record does not reflect that the State struck every prospective juror who was divorced, did not own their own home, or both. The defendant further argues that to determine whether the State's reasons for striking Taylor were discriminatory, it would be necessary to examine whether the State struck all those persons who did not own their own homes and/or were divorced. The defendant notes that the record does not indicate which or how many jurors indicated home ownership. Further, the defendant contends that no one asked any member of the first panel of prospective jurors whether they owned their homes. According to the defendant, the State asked the second panel, of which Taylor was a member, to indicate home ownership by a show of hands. However, the record does not indicate which prospective jurors or how many of them raised their hands. Likewise, the defendant further asserts that the third panel of prospective jurors was asked to indicate, by a show of hands, who owned their homes, but the record's only indication of the response from the prospective jurors is "**SOME JURORS RAISED THEIR HANDS**." The defendant notes that because the record is silent as to the identities of the jurors who did not indicate home ownership, it is impossible for this court to determine if the State excluded all jurors who did not own their homes.

The State's other reason for excluding Taylor was because she was divorced. The defendant notes that three jurors accepted by the State and defense counsel indicated they were unmarried. The defendant asserts that Debbie Elliott and Alfred

Hoose were both members of the first panel of prospective jurors and both indicated they were single, without specifying whether they had been married previously. Additionally, Pamela Moore, a member of the second panel of prospective jurors, stated she was a widow. Beverly McFadden, who was also accepted as a juror from the second panel of prospective jurors, gave no indication of her marital status. Furthermore, Arthur Walker, who was accepted by the State before defense counsel used a peremptory challenge to strike him, stated that he was divorced.

The defendant asserts that although there is no indication in the record of the race of any of the individuals except Taylor, it is abundantly clear that the State did not strike every prospective juror who was unmarried or divorced. Further, the defendant argues that it is impossible to discover from the record whether the State struck every prospective juror who did not own his or her own home. Therefore, he contends, this court cannot conclude the State's offered explanation for its exclusion of Taylor was race neutral. We reject the defendant's argument on this point.

> [T]he fact jurors of different races share a similar characteristic is not dispositive when deciding whether an explanation has been pretextual. *See* [*State v.*] *Collier*, 553 So.2d [815] at 822 [(La.1989)] ("[T]he fact that a State excuses one person with a particular characteristic . . . and not another similarly situated person does not *in itself* show that the State's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the State could have reasonably believed would make him desirable as a juror.") (Emphasis added).

*State v. Elie*, 05-1569, p. 13 (La. 7/10/06), 936 So.2d 791, 800.

Furthermore, because the race of jurors was not noted for the record, we cannot determine from the record whether prospective jurors of different races who were similarly situated were treated differently. Accordingly, we find that the trial court's determination of credibility should not be disturbed on appeal without any evidence

or suggestion in the record that the State's exercise of its peremptory challenges were racially motivated. Therefore, we find that this assignment of error lacks merit.

## *CHALLENGES FOR CAUSE*

In this assignment of error, the defendant contends that it was error for the trial court to deny defense counsel's challenges for cause as to prospective jurors Bobby McPhearson, Stacy Trichel, and Lanette Nichols.

In the trial of an offense necessarily punishable by imprisonment at hard labor, such as the second degree murder charged herein, the defendant and the State each are afforded twelve peremptory challenges. La.Code Crim.P. art. 799.

> Consequently, when a defendant uses all of his peremptory challenges, a trial court's erroneous ruling which deprives him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights. Prejudice is presumed and the conviction and sentence must be reversed. *State v. Jacobs*, 1999-1659 p. 4 (La.6/29/01), 789 So.2d 1280, 1283; *see State v. Cross*, 93-1189 p. 6 (La.6/30/95), 658 So.2d 683, 686; *State v. Robertson*, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280; *State v. Ross*, 623 So.2d 643, 644 (La.1993).

> In order "to prove there has been reversible error warranting reversal of the conviction, defendant need show (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges." *Robertson*, 630 So.2d at 1281. Moreover, the defendant must show that he objected at the time of the ruling to the court's refusal to sustain a challenge for cause of the prospective juror. *Cross*, 93-1189 p. 6, 658 So.2d at 686.

*State v. Jones*, 03-3542, p. 10 (La. 10/19/04), 884 So.2d 582, 588-89.

> Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror. *State v. Allen*, 380 So.2d 28, 30 (La.1980); *State v. Jones*, 282 So.2d 422, 431 (La.1973). However, a mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause. *State v. Anthony*, 98-0406, p. 24 (La.4/11/00), 776 So.2d 376, 392; *State v. Smith*, 430 So.2d 31, 38 (La.1983). Additionally, a prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse him on the grounds of

18

> impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. *State v. Lee*, 559 So.2d 1310, 1318 (La.1990); *State v. Baldwin*, 388 So.2d 664, 671-72 (La.1980), *cert. denied*, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981); *Allen*, 380 So.2d at 30. But, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied. *State v. Hallal*, 557 So.2d 1388, 1389-90 (La.1990).

*State v. Kang*, 02-2812, pp. 4-5 (La. 10/21/03), 859 So.2d 649, 652-53.

The record reflects that defense counsel used all twelve peremptory challenges during jury selection. Therefore, the defendant need only prove the trial court abused its discretion in denying any one of his challenges for cause.

McPhearson and Trichel were both members of the same panel of prospective jurors. During questioning, McPhearson stated that he knew Danny Hall, the investigator for the District Attorney's Office. Also, Billy Joe Harrington, the Assistant District Attorney handling the case, was his cousin. McPhearson further stated that Ronnie Ross, an officer who responded to the Mitchell home on the date of the offenses, grew up down the street from him, and he knew Ronnie's parents really well.

The State then asked McPhearson the following:

> [Y]ou said that you knew uh, knew me that we were cousins, not close but distant cousins, I would say is that right? And you knew Danny Hall and Ronnie Ross. Would you be able to put that aside and be able to listen to only the evidence that comes from this witness chair up here and render a fair verdict?

McPhearson responded, "[y]es sir."

When being questioned by defense counsel, McPhearson stated that he had known Harrington and Hall all of their lives, and they were friends. McPhearson was then questioned as follows:

MR. WASHINGTON: Would you tend to believe Mr. Hall when he tell[s] you something? Is he an honest guy?

MR. BOBBY MCPHEARSON: He never lied to me.

MR. WASHINGTON: What about Mr. Harrington? I know he's a lawyer but I'm gonna [sic] ask you to answer that question anyway.

MR. BOBBY MCPHEARSON: I don't know that he's ever lied to me.

MR. WASHINGTON: So you tend to believe what Mr. Hall and Mr. Harrington say when they tell you something?

MR. BOBBY MCPHEARSON: Yes sir and you too if you . . .

MR. WASHINGTON: Well you don't [sic] me do you? We just met.

MR. BOBBY MCPHEARSON: Yeah but you're a lawyer.

MR. WASHINGTON: I'm a lawyer you can believe me. That was a good one. You would tend to believe Mr. Hall and Mr. Harrington over me cause [sic] you just met me isn't that correct?

MR. BOBBY MCPHEARSON: Not necessarily. You're supposed to deal in the facts, right?

MR. WASHINGTON: I'm supposed to. So you're saying that Mr. Hall tell[s] you someone's guilty of a crime and you've been knowing him all your life, you, rather than if I showed you something different you would believe me over Mr. Hall?

MR. BOBBY MCPHEARSON: If you had the evidence.

Subsequently, defense counsel questioned McPhearson as follows:

MR. WASHINGTON: Would anyone believe a police officer is correct because he is a police officer? I know we had a yes in this bunch.

. . . .

MR. BOBBY MCPHEARSON: Bobby McPhearson. I think we do hold our police officers to a little higher standard than most people.

20

MR. WASHINGTON:  So if a police officer was here and testify . . .

MR. BOBBY MCPHEARSON:  Yes sir.

MR. WASHINGTON:   . . . that someone did something . . .

MR. BOBBY MCPHEARSON:  Yes sir.

MR. WASHINGTON:   . . . you would . . .

MR. BOBBY MCPHEARSON:  Most of the, most of the time that, that police do the right thing, yeah.

MR. WASHINGTON: So if one testified and stated that something took place would you believe him because he's a police officer?

MR. BOBBY MCPHEARSON: Unless you told me that there was something to the contrary.

Prospective juror Stacey Trichel stated that she had known Hall for fifteen years.  Defense counsel then questioned Trichel as follows:

MR. WASHINGTON:  Would you tend to believe what Mr. Hall said if he tell [sic] you something that's true?

MS. STACEY TRICHEL:  Yeah.  I've never known Danny to lie.

Trichel was subsequently asked by defense counsel if it would be tough for her to believe someone else over Hall.  Trichel responded, "[y]eah I would probably give more weight to something he said.  I'd like to think I could listen to the evidence but yes I have known him a long time."  When asked about the credibility of police officers, Trichel stated that, "if they took the stand and testified to something that happened I would believe them."

The State later made the following remarks:

Those of you that said that you would, you would believe what a law enforcement officer said or give them weight, uh, would you tell me by a show of hands if you can't.  But would you be able to put that aside and you'll be instructed by the Judge that what you're supposed to listen to and only consider in this trial is what comes from this chair, right here in evidence that may be presented, not what I argue to you or tell you

21

and not what Mr. Washington does but what comes from right there. So if the Judge instructs you as to that would you be able to put that, those of you that told Mr. Washington that you had issues or you believe a law enforcement officer, would you be able to put that aside and only take into account what you hear from this chair and be fair and impartial and unbiased? Is there anybody that could not do that? Let me see your hands please. Okay. Thank you.

The trial court later asked the panel of prospective jurors, as a group, if they could listen fairly and impartially to each witness to determine the truth of what that witness said without any kind of bias or prejudice and be fair and impartial to the State and the Defendant. In response, all members of the panel raised their hands.

The defendant moved to strike McPhearson for cause, stating that McPhearson knew Hall and his family and defense counsel believed McPhearson's judgment would not be impartial. He further asserted that McPhearson said he would believe a police officer that testified. The trial court denied defense counsel's request. Defense counsel then exercised a peremptory challenge against McPhearson and asked that his objection be noted for the record.

The defendant also moved to excuse Trichel for cause because she stated she would believe a police officer. The State noted Trichel did not raise her hand when the panel was asked if it could not be fair and impartial and was, therefore, rehabilitated. The trial court denied defense counsel's request. Defense counsel then exercised a peremptory challenge against Trichel. The trial court noted defense counsel's objection for the record.

Prospective juror Nichols was not a member of the same panel of prospective jurors as McPhearson and Trichel. When questioned, Nichols stated that she knew Harrington and had personally prepared his income tax returns for the past fifteen years. She also stated that she had known Sheriff Victor Jones her whole life.

Further, the two were from Cloutierville, and he had been friends with her oldest brother at one time. Nichols further testified that she knew Craig LaCour, one of the officers who went to the Mitchell home on the date of the offenses. She stated that she had known LaCour a long time because he was from Cloutierville, and they were good friends at one time.

Defense counsel then questioned Nichols as follows:

MR. WASHINGTON: If their evidence was police officer's [sic] stating, you know, they believe that he did it. Would you believe the police officer because he's an officer?

MS. LANETTE NICHOLS: No the only, I might would [sic] believe Craig because I know Craig, to be honest. But just because they're a police officer, no.

The State then questioned Nichols as follows:

MR. HARRINGTON: Okay. Let's come down to Ms. Nichols. You had, down on the front row just right here. You had stated that you knew the deputy Craig LaCour I think.

MS. LANETTE NICHOLS: Yes.

MR. HARRINGTON: And you said that you would, you would believe him is that, I want to make sure I know what, got exactly what you said?

MS. LANETTE NICHOLS: I've known Craig for a long time and I know him to be honest so I would, yeah I would tend to believe him.

MR. HARRINGTON: But would you be able to put all of that aside and listen to what he says from the witness stand . . .

MS. LANETTE NICHOLS: Mm hm (affirmative).

MR. HARRINGTON: . . . what else you hear from here and be fair and impartial?

MS. LANETTE NICHOLS: Yes.

The defendant later moved to excuse Nichols for cause, as she stated she would believe LaCour's testimony. The trial court denied defense counsel's request.

23

Defense counsel did not object to the ruling. Despite the supreme court's statement in *Jones*, 884 So.2d 582, that a defendant must object at the time of the trial court's refusal to sustain a challenge for cause, it later stated, "[i]n jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule by stating his grounds for a cause challenge and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause. La.C.Cr.P. art. 841." *State v. Pinion*, 06-2346, p. 9 (La. 10/26/07), 968 So.2d 131, 136. Based on the supreme court's latest ruling, we find that the defendant's claim regarding Nichols is properly before us despite defense counsel's failure to object to the ruling.

In brief to this court, the defendant references McPhearson's ties to Harrington, Hall, and Ross. He asserts that although McPhearson stated he could be fair, it would be difficult for McPhearson, who had such close ties to the prosecution and law enforcement, to simply disregard those ties and give the State's representatives no greater credence than other witnesses.

The defendant also asserts that Trichel was not rehabilitated regarding her opinion about police officers. The defendant further asserts that it would be difficult for Nichols to put aside bias resulting from a relationship with one of the State's representatives or witnesses.

In *State v. Paul*, 99-92 (La.App. 5 Cir. 5/19/99), 738 So.2d 1128, the defendant was charged with distribution of cocaine. He challenged four prospective jurors for cause. During questioning by the defendant, a venire member indicated that the testimony of a police officer would be more accurate than that of a non-police officer because a police officer "is at a higher standard." *Id.* at 1130. Three other

24

prospective jurors expressed similar views. The fifth circuit noted that neither the state nor the judge attempted to rehabilitate the prospective jurors after they voiced their bias in favor of police officers. Further, the appellate court stated, "[g]iven that the state's case was based entirely on the testimony of police officers, the potential jurors' general attitudes toward law enforcement officers were highly relevant." *Id*. The fifth circuit also noted that the prospective jurors never expressly stated that they would set aside their biases and give the defendant a fair trial. Therefore, it held that the trial court's failure to grant the defendant's challenges for cause was an abuse of discretion.

In *State v. Lewis*, 08-1381, p. 12 (La.App. 1 Cir. 2/13/09), 7 So.3d 782, 788, *writ denied*, 09-531 (La. 11/20/09), 25 So.3d 787, defense counsel asked the panel, "[D]o any of you believe that law enforcement officers are somehow more credible witnesses than the general public, more likely to tell the truth than just the person picked at random?" Prospective juror Landry indicated he believed law enforcement officers were "more likely to be credible" than random people, and, if a law enforcement officer told him something, he would be "more likely" to believe it to be true. *Id*. The defense challenged Landry for cause, citing his statement that he believed law enforcement officers made more credible witnesses than average people.

The first circuit found there was no abuse of the trial court's broad discretion in denying the challenge for cause against Landry. The court noted the question posed to Landry was not precise enough, in and of itself, to establish the basis for a challenge for cause. It found that Landry's answers reflected no more than a permissible respect for police officers and their training. Further, the defense did not

25

ask Landry if he would believe a police officer if his testimony was contradicted by other evidence.

In *State v. Raymond*, 08-1204 (La.App. 5 Cir. 4/28/09), 13 So.3d 577, *writ denied*, 09-1205 (La. 2/5/10), 27 So.3d 296, prospective juror Roussel indicated he knew the assistant district attorney, one of the investigators, and one of the defendant's attorneys. The trial judge asked whether his acquaintance with or association with those people would affect his decision, and Roussel said, "I think it would, I mean, somebody you know." *Id*. at 583. The trial judge then asked all of the prospective jurors if their relationships with people connected to the case was so strong that they could not treat both sides fairly. For those who wanted to see her privately, the judge advised that they could approach the bench. Roussel did not respond, nor did he approach the bench.

Defense counsel in *Raymond* subsequently questioned Roussel, asking him how well he knew the assistant district attorney and the investigators. Roussel informed defense counsel that defendant's other counsel, Mr. Acosta, went to school with his oldest daughter and that he had known him for "quite a few years." *Id*. Roussel explained that the investigator and he both had LSU tickets and saw each other routinely. He also explained that the investigator's daughter played softball, that he was a coach, and that he knew them fairly well. Roussel stated that, in their younger days, he and the assistant district attorney played ball together and "things like that." *Id*. When asked if his relationship with the investigator or the defendant's attorney would affect his decision in any way for or against the State, Roussel stated, "[t]hat's hard to say. I mean, it plays on your mind, you know. When you're hearing something from someone you know I think that bears more weight than from

26

somebody you don't." Defense counsel asked Roussel if that would influence his decision, and Roussel replied, "I would think it's definitely in my mind." *Id*. at 584.

The fifth circuit noted that Roussel indicated that he thought his relationships with defense counsel, the ADA, and one of the investigators would influence him, but he did not say whether they would influence him either toward the State or the defense. Additionally, when the trial court asked the prospective jurors whether there was anyone who could not follow the law, Roussel did not respond. Roussel also did not respond when the trial judge asked the prospective jurors whether there was anyone who could not hold the State to its burden of proof, give the defendant the presumption of innocence, find him not guilty if the case was not proven beyond a reasonable doubt, or not hold it against the defendant if he chose not to testify. Further, Roussel did not respond when the trial judge asked whether there was any reason that the prospective jurors could not be fair to both sides.

The fifth circuit found, viewing Roussel's responses as a whole, that Roussel did not reasonably imply bias, prejudice, or inability to render a lawful judgment. Thus, it found the trial court did not err by denying the challenge for cause of Roussel based on his relationships with defense counsel, the ADA, and one of the investigators.

Defense counsel also argued that Roussel was incapable of serving as an impartial juror because he said he would tend to believe a police officer over someone else. Defense counsel asked the prospective jurors whether they would give more credibility to the testimony of a police officer than a lay witness, and Roussel stated, "[y]ou would think you would tend to believe that person before somebody else." *Id*.

at 585.  Defense counsel then asked, "[a]nd that's simply because they're a police officer, correct?"  Roussel responded, "[y]ou would think."  *Id.*

The fifth circuit found that Roussel did not unequivocally state that he would believe a police officer over someone else.  He merely said "you would think" you would believe a police officer over someone else.  *Id.* at 586.  Additionally, Roussel silently acquiesced when he did not respond to the trial court's inquiry as to whether there was anyone who could not hold the State to its burden of proof, give the defendant the presumption of innocence, or be fair to both sides.  The fifth circuit then found, based on Roussel's voir dire testimony and the great deference that a reviewing court should accord to a trial court's decision regarding challenges for cause, the trial judge did not err by denying the challenge for cause of Roussel.

Against this statutory and jurisprudential backdrop, we now turn to the individual challenges for cause in question.

McPhearson

The record shows that defense counsel challenged McPhearson for cause based on his relationship with Hall and his statements indicating he would believe a police officer that testified.  Defense counsel did not assert the challenge because McPhearson was related to Harrington or knew Ross.  Thus, he may not now assert those reasons as bases for why the challenge for cause should have been granted.  Uniform Rules—Courts of Appeal, Rule 1–3.  Accordingly, we are only presented with the question of whether the challenge for cause should have been granted because of McPhearson's relationship with Hall and his comments regarding the truthfulness of police officers.

From the outset, we note that Hall did not testify at trial and that defense counsel was aware he would not testify at trial at the time voir dire was conducted. McPhearson stated he would believe a police officer's testimony unless he was presented with something to the contrary. Thus, McPhearson did not state he would unquestionably credit the testimony of police officers. Further, this case is distinguishable from *Paul*, 738 So.2d 1128, in that when prospective jurors were asked to raise their hands if they could not set aside their predisposition and be fair and impartial, McPhearson did not raise his hand. Thus, he silently acquiesced, as was done in *Raymond*, 13 So.3d 557. Accordingly, based on the cases cited herein, we find that the trial court properly denied defense counsel's challenge for cause as to prospective juror McPhearson.

Trichel

Again, the record shows that Trichel knew Hall. Nevertheless, as observed above, Hall did not testify at trial. As in *Lewis*, 7 So.3d 782, Trichel was not asked if she would believe a police officer's testimony if it was contradicted. Further, she did not raise her hand when asked to do so if she could not be fair and impartial. Thus, she silently acquiesced. *Raymond*, 13 So.2d 557. Accordingly, based on the cases cited herein, we find that the trial court properly denied defense counsel's challenge for cause as to prospective juror Trichel.

Nichols

Nichols did not testify that she would unquestionably believe the testimony of a police officer over that of other witnesses. She did state she would tend to believe LaCour. However, she subsequently indicated she could be fair and impartial. We find that this case is distinguishable from *Paul*, 738 So.2d 1128, because Nichols

expressly stated she would set aside her bias. Accordingly, we find that the trial court properly denied defense counsel's challenge for cause as to prospective juror Nichols.

Based upon the foregoing, this assignment of error is without merit.

## EXCESSIVENESS OF SENTENCE

The defendant contends the maximum sentence of fifty years on the charge of attempted second degree murder is excessive and that the imposition of a consecutive sentence of life imprisonment for his conviction on the charge of second degree murder rendered both sentences excessive under the circumstances.

At the sentencing hearing, defense counsel objected to the court's sentencing choice but stated no basis for the objection. In his motion to reconsider sentence, the defendant asserted that his sentence for attempted second degree murder was excessive and that the trial court failed to consider several mitigating factors. The defendant did not assert that the consecutive nature of his sentences rendered his sentences excessive. Accordingly, this court will not consider that claim. *See* La.Code Crim.P. art. 881.1(E); Uniform Rules—Courts of Appeal, Rule 1–3; *State v. Blue*, 09-1111 (La.App. 3 Cir. 4/7/10), 34 So.3d 447. However, we will review the defendant's claim that his sentence for attempted second degree murder is excessive, as it was preserved in the defendant's motion to reconsider sentence.

> The Eighth Amendment to the United States Constitution and La. Const. art. 1, § 20 prohibit the imposition of cruel or excessive punishment, and the law is well settled with regard to what constitutes cruel or excessive punishment. An excessive sentence is a penalty that is so grossly disproportionate to the severity of the crime that it shocks our sense of justice or it makes no measurable contribution to acceptable penal goals and, therefore, is nothing more than a needless imposition of pain and suffering. *State v. Campbell,* 404 So.2d 1205 (La.1981). Additionally, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, the reviewing court should not deem as excessive a sentence imposed within statutory limits. *State v. Howard,* 414 So.2d 1210 (La.1982); *State v. Pyke,* 95-

919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713.  Still, a sentence that falls within the statutory limits may be excessive under the particular circumstances of a given case.  *State v. Sepulvado,* 367 So.2d 762 (La.1979).  Additionally, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood,* 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225.  The only relevant question for the reviewing court to consider is not whether another sentence would be more appropriate, but rather whether the trial court abused its broad discretion in sentencing a defendant. *State v. Cook,* 95-2784 (La.5/31/96), 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Louisiana Code of Criminal Procedure Article 894.1(A) provides that the trial court should impose an imprisonment sentence if any of the following are established by the record:

> (1) There is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime.
>
> (2) The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution.
>
> (3) A lesser sentence will deprecate the seriousness of the defendant's crime.

Additionally, the trial court must "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." La.Code Crim.P. art. 894.1(C).  However, in complying with this article, the trial court "need not articulate every circumstance or read through a checklist of items." *State v. Anderson,* 95-1688, p. 4 (La.App. 3 Cir. 5/8/96), 677 So.2d 480, 483.

> . . . .

Citing the supreme court in *State v. Telsee*, 425 So.2d 1251 (La.1983), the fifth circuit, in *State v. Lisotta*, 98-648, p. 4 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, 58, *writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183, suggested that:

> The court should consider three factors in reviewing a judge's sentencing discretion:
>
> 1.  the nature of the crime,
>
> 2.  the nature and background of the offender, and

> 3. the sentence imposed for similar crimes by the same
> court and other courts.

*State v. Fontenot*, 09-1044, pp. 4-6 (La. App. 3 Cir. 5/12/10), 38 So.3d 1122, 1125-26.

In the present case, a jury convicted the defendant of attempted second degree murder, a crime punishable by a term of imprisonment at hard labor of not less than ten nor more than fifty years, without benefit of probation, parole, or suspension of sentence. La.R.S. 14:30.1; La.R.S. 14:27. The defendant was sentenced to the maximum term of imprisonment.

At the sentencing hearing, the trial court stated it had reviewed the presentence investigation report. It noted that the defendant committed the offense while on probation. It further noted the defendant had a significant criminal history and had numerous charges and convictions as a juvenile, including a conviction for sexual battery. As an adult, he was charged with simple burglary on July 10, 2003, and four counts of simple burglary and two counts of possession of Schedule IV drugs on September 21, 2004. On April 4, 2005, he entered a plea bargain in which he pled guilty to two counts of burglary. The other charges, including the burglary charge from July 10, 2003, were dismissed as a part of the plea bargain. At that time, the court sentenced the defendant to five years at hard labor, which was suspended, and he was placed on five years supervised probation. The defendant later violated his probation, and it was revoked on September 16, 2005. Just three months before the revocation, the defendant committed the crimes at issue herein.

The trial court then stated the following:

> The guidelines mandate that when a defendant has been convicted of a
> felony, the Court should impose a sentence of imprisonment if any of the
> three circumstances exist. The Court finds that all of these circumstances
> exist. The Court finds that there is an undue risk that during a period of
> a suspended sentence or probation the defendant will commit another

32

crime. The defendant is in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution and a lesser sentence would deprecate the seriousness of the defendant's crime. The guidelines provide other considerations for the Court. The Court finds that there are several factors applicable to the present case and finds them to be aggravating circumstances. The first is number one of the guidelines: The offender's conduct during the commission of the offense manifested deliberate cruelty to the victim in that the defendant attempted to kill Tyler, not just once, but twice. Once when he attacked Tyler in his sleep and was choking him and again when he shot him. Number two: The offender knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability or ill health. He attached [sic] Tyler, a teenaged boy in his sleep. Number five of the guidelines: The offender knowingly created a risk of death or great bodily harm to more than one person. He broke into a family's house, armed with a loaded gun and he could have left or retreated at any time before any harm was done to any victim. Number six: The offender used threats of or actual violence in the commission of the offense. There was of course clearly actual violence in this case as he attacked and choked Tyler and shot him and shot and killed Timothy. Number nine: The offense resulted in a significant, permanent injury or significant economic loss to the victim or his family. There is no more permanent injury than death. This family lost a husband, a father, a son, a brother. Not to mention the horrific effect this has had on Tyler. Number ten: The offender used a dangerous weapon in the commission of this offense. Of course the defendant used a gun in his crime. He brought it into the house with him. Number eighteen: The offender foreseeably endangered human life by discharging a firearm during the commission of an offense which has as an element the use, attempted use or threatened use of physical force against a person or property of another in which by it's [sic] very nature involves a substantial risk that physical force may be used in the course of committing the offense. This is clearly applicable. He brought the gun into the house and did kill and injure the victims respectively. Number nineteen: The offender used a firearm or other dangerous weapon while committing or attempting to commit an offense which has as an element the use, attempted use or threatened use of physical force against the person or property of another, in which by it's [sic] very nature involves a substantial risk that physical force may be used in the course of committing the offense. The defendant did use a firearm in perpetrating this Second Degree Murder and Attempted Second Degree Murder. Number twenty-one: Asked the Court to consider if there are any other relevant aggravating circumstances. And in summary the Court finds that the defendant attacked Tyler in his sleep but then had the opportunity to leave without doing any further harm to Tyler. As he ran to escape, the defendant stopped and turned and shot Tyler. The Court has also reviewed the mitigating circumstances listed in the . . .

guidelines under Number twenty-two through thirty-two and finds that none were applicable to the defendant. Further the Court does not find that there are any mitigating circumstances.

Our review of the sentencing hearing shows that the trial court thoroughly reviewed the sentencing factors set forth in La.Code Crim.P. art. 894.1, the nature of the offense, and the defendant's criminal history.

In support of his argument that his sentence is excessive, the defendant cites *State v. Letulier*, 97-1360 (La. 7/8/98), 750 So.2d 784. We find the defendant's reliance on *Letulier* misplaced. Our review of that case shows that the defendant pled guilty to first degree murder and was sentenced to death; he also pled guilty to attempted second degree murder, armed robbery, and simple arson, and was sentenced to the maximum term of imprisonment on each charge. On appeal, the supreme court reviewed the death sentence imposed for first degree murder and not the sentence of attempted second degree murder.

Our review of a sampling of sentences imposed for attempted second degree murder shows that the trial court's sentencing choice in the present case was not out of line. *See State v. Martinez*, 09-740 (La.App. 5 Cir. 3/23/10), 38 So.3d 926 (where the defendant was convicted of attempted second degree murder for stabbing the victim eighteen times and was sentenced to forty-nine and one half years); *State v. Trepagnier*, 97-2428 (La.App. 4 Cir. 9/29/99), 743 So.2d 818 (where the defendant was convicted of attempted second degree murder for shooting the victim and was sentenced to fifty years at hard labor without benefit of probation, parole, or suspension of sentence); *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713, (where the defendant, who had an extensive arrest record and a prior

misdemeanor conviction, was convicted of attempted second degree murder and sentenced to fifty years at hard labor).

After reviewing the nature of the offense in the case now before us, the fact that the defendant committed this crime in conjunction with second degree murder and the fact that the defendant committed the offense of attempted second degree murder while he was on probation, we find the defendant's maximum sentence is not excessive. Accordingly, this assignment of error lacks merit.

## DECREE

The defendant's convictions and his sentence for attempted second degree murder are affirmed. Additionally, we direct the trial court to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**